UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON DIVISION
C/A NO.:  8:08-2995-RBH

| | |
|---|---|
| ROBERT A. LATHAM, individually and on behalf of all others similarly situated, | ) ) ) |
| Plaintiff, | ) ) ) |
| -vs- | ) ) ) |
| BILL MATTHEWS, PAMELA M. BUNES, ROBERT C. SCHERNE, KEVIN F. PICKARD, LOWELL T. HARMISON, MARVIN H. FINK, and SIGNALIFE, INC., | ) ) ) ) ) |
| Defendants. | ) ) ) |

## CLASS ACTION COMPLAINT

Plaintiffs, by their attorneys, on behalf of themselves and all others similarly situated, allege the following upon personal knowledge as to their acts and as to all other matters based upon, inter alia, the investigation made by their attorneys, including a review of public filings of Signalife, Inc. ("Signalife" or the "Company"), with the United States Securities and Exchange Commission ("SEC"), as well as published reports, conference calls, Company press releases, Internet research, and articles in the news media.

## NATURE OF THE ACTION

1.     This is a class action brought on behalf of all purchasers of the common stock of Signalife (formerly known as Recom Managed Systems, Inc.) between January 29, 2004 and

1

April 11, 2008, inclusive (the "Class Period"). Plaintiff brings this action under Section 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. Section 78j(b) and Section 78t(a), and Rule 10b-5, 17 C.F.R. Section 240 10b-5, promulgated thereunder by the SEC.

3.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b). Signalife lists its principal address as 531 South Main Street, Suite 301, Greenville, South Carolina 29601.

4.     In connection with the acts, conduct and other wrongs alleged in this Complaint, the defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails, telephone communications and the facilities of national securities exchanges.

## THE PARTIES

5.     Plaintiff purchased shares of the common stock of Signalife during the Class Period and was damaged thereby, as set forth in the attached certification.

6.     Defendant Signalife is a public company incorporated under Delaware law and its stock throughout the Class Period was traded on the American Stock Exchange ("AMEX").

7.     Defendant Bill Matthews ("Matthews") served as President for Product Development of the Company during the Class Period.

8.    Defendant Pamela M. Bunes ("Bunes") served as President, Chief Executive Officer, and Director of the Company during the Class Period. After the end of the Class Period she was replaced by non-defendant, Rowland Perkins, as CEO.

9.    Defendant Robert C. Scherne ("Scherne") served as Interim Chief Financial Officer and Director of the Company during the Class Period.

10.    Defendant Kevin F. Pickard ("Pickard") served as Interim Chief Financial Officer, and Director of the Company during the Class Period.

11.    Defendant Lowell T. Harmison ("Harmison") served as President and Chief Operating Officer of the Company during the Class Period. On June 3, 2008, the Company announced that Harmison had taken an indefinite leave of absence and that Lee B. Erlichman would become President and Chief Operating Officer.

12.    Defendant Marvin H. Fink was Chief Executive Officer and Chairman of the Board from October 2002 to March 21, 2005.

13.    The individual defendants, as the senior officers and spokespersons of Signalife, were the controlling persons of the Company within the meaning of Section 20(a) of the Exchange Act and had the power and influence, and exercised the same, to cause the Company to engage in the unlawful conduct complained of herein.

### CLASS ACTION ALLEGATIONS

14.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of a Class, consisting of all persons who purchased or otherwise acquired Signalife common stock between January 29, 2004 and April 11, 2008 inclusive, and who were damaged thereby. Excluded from the Class are defendants, members of

3

the immediate family of Defendants and any subsidiary or affiliate of Signalife and the directors, officers and employees of Signalife or its subsidiaries or affiliates, or any entity in which any excluded person has a controlling interest, and the legal representatives, heirs, successors and assigns of any excluded person.

15.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are thousands of members of the Class located throughout the United States. As of May 12, 2008, Signalife had approximately 60,609,220 common shares outstanding. Throughout the Class Period, Signalife common stock was actively traded on the AMEX (an open and efficient market) under the symbol "SGN." (On May 15, 2008, the Company announced that it would voluntarily withdraw its stock from listing and trading on the AMEX). Record owners and other members of the Class may be identified from records maintained by Signalife and/or its transfer agents and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

16.     Plaintiff's claims are typical of the claims of the other members of the Class because all members of the Class were similarly affected by defendants' wrongful conduct in violation of the federal law plaintiff complains of herein.

17.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

4

18.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by defendants' acts and omissions as alleged herein;

b.    whether defendants participated in and pursued the scheme and common course of conduct complained of herein;

c.    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders during the Class Period misrepresented material facts about the business, finances, financial condition and prospects of Signalife;

d.    whether statements made by defendants to the investing public during the Class Period misrepresented and/or omitted to disclose material facts about the business, finances, value, performance and prospects of Signalife;

e.    whether the market price of Signalife common stock during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

f.    the extent to which the members of the Class have sustained damages and the proper measure of damages.

19.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and

burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this suit as a class action.

## SUBSTANTIVE ALLEGATIONS

20.     On January 29, 2004, Signalife, then known as Recom Managed Systems, Inc., issued a press release announcing that it had "received approval from the Food and Drug Administration to proceed with the sales and marketing of its first medical device B a 12-lead [electrodes attached to a patient's arms, chest and legs] 24-hour ECG [electrocardiogram] medical device that the Company believes is the premier ambulatory 12-lead ECG device in the industry." Defendant Fink called the Company's ECG device "revolutionary" in the press release. When the Company disseminated this press release, the price of its stock jumped from a closing price of $3.10 on January 28, 2004 to close at $4.10 on January 29, 2004.

21.     This statement was false and misleading. As alleged below, the Company had no means to manufacture or market any kind of saleable model 100 ECG device. Defendants knew or recklessly disregarded that Signalife did not have the means to bring any such product to market.

22.     On February 10, 2004, the Company filed its 2003 Form 10-KSB for the year ended December 31, 2003. The 2003 Form 10-KSB was signed by, among others, Defendants Fink and Harmison. The Company stated in the 2003 Form 10-KSB that it had recently completed development of the "front end" or hardware portion of its model 100 heart monitor, and received FDA 510(k) marketing approval on January 28, 2004 to market that portion of the device in the U.S. because it was substantially equivalent to other devices on the market. The

6

Company stated that it was "currently developing the 'back end' or software portion" of its model 100 heart monitor, which allows the management and interpretation of the data. The Company stated that FDA approval was generally not required for the software portion of its monitor. The Company stated:

> Once we have completed these steps, we must design and engineer a 'production' model for mass manufacturing which will be durable, reliable and maintenance-free, and competitively priced. *We anticipate that we will complete a production model of our model 100 heart monitor, integrating both back-end and front-end functions, by the end of fiscal 2005, and will have also commenced commercial marketing efforts by the end of that period.*
>
> In the longer term, we will also market heart monitors for each of the exercise and clinical (resting) segments of the ECG market.

*   *   *   *

23.     The foregoing statements were false and misleading, because Defendants knew or recklessly ignored that Signalife had insufficient resources and means to market the model 100 heart monitor by the end of 2005. As discussed below, the Company nevertheless continued to tout its product as marketable, even though Signalife has never successfully sold its products anywhere. Even as of the date of the filing of this complaint, the Company's website (www.signalife.com), referring to its heart monitor, states: "Even with many advancements in medical science and the cardiac care industry, one major and vital breakthrough has always been needed to allow for a quantum leap in the saving of lives of heart patients. *This breakthrough has now been achieved.*" (emphasis added).

24.     On May 17, 2004, the Company filed its quarterly report on SEC Form 10-Q for the period ended March 31, 2004, signed and certified by Marvin H. Fink, then President and

7

Principal Executive Officer. The Company represented in that Form 10-Q that the 510(k) was granted to its marketing on January 28, 2004 because the Company's device was "substantially equivalent to other devices on the market" and that the Company only needed to develop software to interpret the data and engineer a production model for mass manufacturing.

25.    These statements were false and misleading. For the reasons stated above.

26.    On December 16, 2004, Signalife issued a press release announcing that it had "completed pre-production fabrication of the Model 100 Ambulatory ECG System." According to the press release: "The design has successfully passed all applicable regulatory safety testing requirements of the Food and Drug Administration (FDA) recognized voluntary consensus standards for general requirements for the safety of medical electrical equipment and IEC 60601-1, and now can now proceed to market." The press release quoted Defendant Matthews as stating:

> The completion of pre-production prototype is a significant milestone. In conjunction with Battelle Memorial Institute, we have not only completed a fully functional and compliant Model 100 device, but have done so ahead of schedule, within budget and in alignment with FDA's Quality System Regulations. Today's announcement follows the Company recent press releases that it had achieved compliance with all regulatory requirements and industry consensus standards now allowing for a technology transfer to manufacturing. This included the successful passing of the stringent Federal Communications Commission (FCC) requirements for Human Exposure to Radiofrequency (RF), the medical device industry's voluntary consensus standards for electromagnetic compatibility (EMC), the consensus standards for ambulatory heart monitoring devices (EC-38), and the safety standard relating to medical electrical equipment (IE 60601-1). Moreover, our test results validate our device can be used in a transport setting.

27.    When the Company issued this release, its stock price increased by more than 5%, to close at $5.10 as compared to the previous day's closing price of $4.85.

28.     On March 31, 2005, Signalife filed its 2004 Form 10-KSB with the SEC, signed by Defendants Harmison, Scherne, and Bunes. It contained representations about the Model 100 device which were substantially similar to those set forth in the December 16, 2004 press release.

29.     On May 16, 2005, Signalife filed its Form 10-QSB with the SEC for the quarterly period ended March 31, 2005 (the "March 31, 2005 Form 10-QSB"), signed by Defendants Bunes and Scherne. It contained representations about the Model 100 device which were substantially similar to those set forth in the December 16, 2004 press release.

30.     On August 15, 2005, Signalife filed its Form 10-QSB with the SEC for the quarterly period ended June 30, 2005 (the "June 30, 2005 Form 10-QSB"), signed by Defendants Bunes and Scherne. It contained representations about the Model 100 device which were substantially similar to those set forth in the December 16, 2004 press release.

31.     On November 15, 2005, Signalife filed its Form 10-QSB with the SEC for the quarterly period ended September 30, 2005 (the "September 30, 2005 Form 10-QSB"), signed by Defendants Bunes and Scherne. It contained representations regarding the Model 100 device that were substantially similar to those set forth in the December 16, 2004 press release. In addition, the September 30, 2005 Form 10-QSB stated:

> In October 2005 we entered into a contract manufacturing agreement with a private-label manufacturer to manufacture Model 100 Modules and to package our Model 100 Monitor System, and have placed our first order to purchase 100 Model 100 Modules under this agreement. We anticipate that these devices will be manufactured and commercially available for sale in the first week of December 2005.

32.     Unbeknownst to the investing public, the above referenced statements in the December 16, 2004 press release, the 2004 Form 10-KSB, the March 31, 2005 Form 10-QSB,

9

the June 30, 2005 Form 10-QSB, and the September 30, 2005 Form 10-QSB were materially false and misleading because:

    a.  the Fidelity 100 units had not performed satisfactorily in any arm's length, objective trials they had undergone.

    b.  the design of the Model 100 device was incomplete and not ready for full scale distribution in the foreseeable future.

33.    On March 30, 2006, at 7:00 AM, Signalife issued a press release announcing a "marketing partnership" between Signalife and Rubbermaid Medical Solutions ("RMS"). According to the press release, which included a statement by Defendant Bunes, the multi-year agreement involved the "nationwide rollout of Signalife's flagship Fidelity 100 ECG heart monitor and other Signalife products."

34.    The Company's announcement of a "nationwide rollout" of Signalife's product by a major retail sales organization had a profound effect on Signalife's stock. Signalife's stock climbed from $3.10 to $3.25 (approximately 5%), in extremely heavy trading.

35.    On or about March 31, 2006, Signalife filed its 2005 Form 10-KSB with the SEC, signed by Bunes and Scherne, among others. It elaborated on the Signalife/RMS "marketing partnership."

36.    Both the March 30, 2006 press release and the 2005 Form 10-KSB, filed with the SEC on March 31, 2006, were materially false and misleading because they failed to disclose that:

    a.  the Fidelity 100 units had not performed satisfactorily in any arm's length, objective trials they had undergone.

b.    the design of the Fidelity 100 was incomplete and the Fidelity 100 would not be available for full scale distribution in the foreseeable future.

c.    there were no actual orders for products.

d.    the products manufactured by Signalife were incomplete and defective and did not perform to design and performance specifications.

e.    the Holter Monitor had not been developed, and it was still in a concept phase and was not even ready for field trials.

f.    due to "a" through "e" above, RMS would not be able to sell any of Signalife's products.

37.    On May 15, 2006, Signalife filed its Form 10-QSB for the quarter ended March 31, 2006 with the SEC (the "March 31, 2006 Form 10-QSB"), was signed by Defendants Bunes and Scherne. It contained disclosures substantially identical to the disclosures set forth above.

38.    The May 15, 2006 Form 10-QSB for the March 31, 2006 period was materially false and misleading for the reasons set forth herein.

39.    On August 17, 2006, Signalife filed its Form 10-QSB for the quarter ended June 30, 2006 with the SEC (the "June 30, 2006 Form 10-QSB"), signed by Defendants Bunes and Scherne. It contained disclosures substantially identical to the disclosures set forth above.

40.    The June 30, 2006 Form 10-QSB was materially false and misleading for the reasons set forth herein.

41.    On October 11, 2006, Defendants caused a Form S-8 to be filed with the SEC. This document, signed by Defendants Bunes and Scherne, contained disclosures substantially identical to the disclosures set forth above.

11

42.     The Form S-8 was also materially false and misleading for the reasons set forth herein. The Form S-8 was also materially false and misleading because it stated that Signalife was marketing its Fidelity 100 Monitor System in the United States both through its internal sales and marketing staff and through RMS when, in fact, because Signalife's products were unsalable and because Signalife had materially breached its agreement with RMS, RMS was not marketing Signalife's products and had no plans to market Signalife's products. Accordingly, the following statement appearing in the Company's Form S-8 was also materially false and misleading: "Rubbermaid will, at its cost, put together a national sales force to market the Fidelity 100 Monitor System, and will also advertise and otherwise vigorously promote these products in medical literature, at trade shows, and through other mechanisms as set forth in the agreement."

43.     On October 27, 2006, the Company filed a Form 8-K with the SEC. It stated that:

a.     On October 23, 2006, Rodney Hildebrandt resigned as a Director and as Signalife's Chief Operating Officer.

b.     On October 23, 2006, Signalife terminated the services of Defendant Scherne as its Chief Financial Officer, and hired Defendant Pickard to serve in that position going forward.

44.     November 14, 2006, Signalife filed its Form 10-QSB for the quarter ended September 30, 2006 with the SEC (the "September 30, 2006 Form 10-QSB"). This document, signed by Defendants Bunes and Pickard, contained disclosures which were substantially identical to the disclosures set forth above.

12

45. The September 30, 2006 Form 10-QSB was materially false and misleading for the reasons set forth herein. In addition, the September 30, 2006 Form 10-QSB was materially false and misleading because it failed to disclose that there was a dispute between Signalife and RMS arising from Signalife's breach of the agreement.

46. The September 30, 2006 Form 10-QSB was also materially false and misleading because Defendants caused the September 30, 2006 Form 10-QSB to contain the following statements when Defendants knew that, due to the non-salability of Signalife's products and Signalife's material breach of its agreement with RMS, RMS was not marketing Signalife's products and had no plans to market Signalife's products:

      a.    "We are currently marketing our products and services...in certain cases on a co-exclusive basis through Rubbermaid Inc. ("Rubbermaid"), a subsidiary of Newell Rubbermaid Inc."

      b.    "Rubbermaid is currently in the process of developing and training its sales staff under this agreement."

      c.    ". . . our plan of operation for the twelve month period commencing October 1, 2006 is to commence our marketing and sales activities with respect to our Fidelity 100 Monitor System and Signalife Holter Monitor principally through Rubbermaid . . . ."

47. On November 27, 2007, Signalife and RMS entered into an amendment to the March 26, 2006 agreement and a standstill agreement while the two companies hoped to resolve the issue of Signalife's breach through negotiation. Although the agreement with RMS was

13

Signalife's most material contract, Signalife failed to issue a Form 8-K which would have timely served to inform investors that:

    a.    Signalife had breached its agreement with RMS as described above.

    b.    the March 26, 2006 agreement had been modified on November 27, 2007.

    c.    due to the non-salability of Signalife's products and Signalife's material breach of its agreement with RMS, RMS was not marketing Signalife's products and had no plans to market Signalife's product.

    d.    That a standstill agreement had been executed, as the Signalife and RMS hoped to resolve the issue of Signalife's breach through negotiation.

48.    On January 29, 2007, Signalife issued a press release announcing procurement of a $10 million credit facility and the filing of an action against RMS and termination of the Signalife/RMS agreement due to RM's "failure to perform under that agreement."

49.    On January 30, 2007, Signalife filed a Form 8-K with the SEC disclosing that, on January 24, 2007 the agreement between Signalife and RMS had been terminated and that cross-claims had been filed.

50.    On April 2, 2007, Signalife filed its 2006 Form 10-KSB with the SEC. This document, signed by Defendants Bunes, Pickard, and Harmison, among others, contained

14

substantially the same information concerning RMS as the Company's January 30, 2007 Form 8-K.

51.    The Company's 2006 Form 10-KSB was materially false and misleading for the reasons set forth herein.

52.    In addition, the 2006 Form 10-KSB stated:

Since January 1, 2007, pursuant to a previously negotiated arrangement that had been suspended during the Rubbermaid negotiations and contractual undertakings, we have issued a total of 696,853 common shares to or for the benefit of the principal of The Silve Group as compensation for the provision of product marketing and distribution services rendered by that company during the first quarter of fiscal 2007 in connection with organizing, introducing us to and procuring specific international sales and distribution channels, partners and relationships. The contractual relationship did not take effect until the beginning of 2007, when Signalife requested that the company begin performing services.

53.    The foregoing statement was materially false and misleading because, as later disclosed in the March 31, 2007 Form 10-QSB:

a.    896,583 shares of Signalife stock were issued to the Silve Group between January 1, 2007 and March 31, 2007; not 696,853 shares as represented.

b.    the shares which were issued to the Silve Group between January 1, 2007 and March 31, 2007 were not issued as compensation "for the provision of product marketing and distribution services rendered by that company during the first quarter of fiscal 2007" in connection with organizing, introducing Signalife to and procuring specific international sales and distribution channels, partners and relationships. The shares were issued as "advances for future sales commissions."

54. The Silve Group was unable to sell Signalife's products or arrange for distribution of Signalife's products because:

    a. The Fidelity 100 units had not performed satisfactorily in any arm's length, objective trials which they had undergone.

    b. the design of the Fidelity 100 was not complete and the Fidelity 100 would not be available for full scale distribution in the foreseeable future.

    c. the products manufactured by Signalife were incomplete and defective and did not perform to design and performance specifications.

    d. the Holter Monitor had not been developed, and it was still in a concept phase and was not even ready for field trials.

55. The representation was contained in the SEC filing solely to counter RMS' assertion that "the Fidelity 100 was not commercially ready for sale" (March 31, 2007 Form 10-QSB at page 15), and to falsely induce investors into believing that Signalife had viable marketable products, and promising business prospects.

56. On May 15, 2007, Signalife filed its Form 10-QSB for the quarter ended March 31, 2007 with the SEC (the "March 31, 2007 Form 10-QSB"). This document, signed by Defendants Bunes and Pickard, contained substantially the same information concerning RMS as did the January 30, 2007 Form 8-K.

57. The 2006 Form 10-KSB was materially false and misleading for the reasons set forth above.

58. The March 31, 2007 Form 10-QSB further stated:

During the three-month interim period ended March 31, 2007,

16

pursuant to a previously negotiated arrangement that had been suspended during the Rubbermaid negotiations and contractual undertakings, we have issued a total of 896,583 common shares to or for the benefit of the principal of The Silve Group as advances for future sales commissions during the first quarter of 2007 in connection with organizing, introducing us to and procuring specific international purchase orders, sales and distribution channels, partners and relationships. These shares were valued at $1,698,951 based upon the fair market value of the shares determined as the closing stock price as reported by AMEX at the dates of issuance. Under our agreement with The Silve Group, they are entitled to 20% of all contract revenues they procure. Under that agreement, we will from time-to-time make prepayments against expenses, costs and other factors, which will be offset against contract revenues when received. The contractual relationship did not take effect until the beginning of 2007, when Signalife requested that The Silve Group begin performing services.

59.    This disclosure was materially false and misleading for the reasons set forth above.

60.    On August 10, 2007, Signalife filed its Form 10-QSB for the quarter ended June 30, 2007 with the SEC (the "June 30, 2007 Form 10-QSB"). This document, signed by Defendants Bunes and Pickard, contained substantially the same information concerning RMS as did the January 30, 2007 Form 8-K.

61.    The 2006 Form 10-KSB was materially false and misleading for the reasons set forth above.

62.    In addition, the June 30, 2007 Form 10-QSB stated:

During the six-month interim period ended June 30, 2007, pursuant to a previously negotiated arrangement that had been suspended during the Rubbermaid negotiations and contractual undertakings, we have issued a total of 1,406,583 common shares to or for the benefit of the principal of The Silve Group as advances for future sales commissions during the six-month interim period ended June 30, 2007 in connection with organizing, introducing us to and

17

procuring specific international purchase orders, sales and distribution channels, partners and relationships. These shares were valued at $2,498,651 based upon the fair market value of the shares determined as the closing stock price as reported by AMEX at the dates of issuance. Under our agreement with The Silve Group, they are entitled to 20% of all contract revenues they procure. Under that agreement, we will from time-to-time make prepayments against expenses, costs and other factors, which will be offset against contract revenues when received. The contractual relationship did not take effect until the beginning of 2007, when Signalife requested that The Silve Group begin performing services.

63.    This disclosure was materially false and misleading for the reasons set forth above.

64.    On November 14, 2007, Signalife filed its Form 10-QSB for the quarter ended September 30, 2007 with the SEC (the "September 30, 2007 Form 10-QSB"). This document, signed by Defendants Harmison and Pickard, contained substantially the same information concerning RMS as did the January 30, 2007 Form 8-K.

65.    The 2006 Form 10-KSB was materially false and misleading for the reasons set forth above.

66.    In addition, the September 30, 2007 Form 10-QSB stated:

During the nine-month interim period ended September 30, 2007, pursuant to a previously negotiated arrangement that had been suspended during the Rubbermaid negotiations and contractual undertakings, we have issued a total of 1,546,583 common shares to or for the benefit of the principal of The Silve Group as advances for future sales commissions during the nine-month interim period ended September 30, 2007 in connection with organizing, introducing us to and procuring specific international purchase orders, sales and distribution channels, partners and relationships. These shares were valued at $2,637,251 based upon the fair market value of the shares determined as the closing stock price as reported by AMEX at the dates of issuance. Under our agreement with The Silve Group, they are entitled to 20% of all contract revenues they procure. Under that agreement, we will from time-to-time make prepayments against expenses, costs and other factors, which will be offset against contract revenues when received. The contractual relationship did not take effect until the beginning of 2007, when Signalife requested that The Silve Group begin performing services.

18

* * *

Since the end of the third quarter of fiscal 2007, we issued a total of 250,000
common shares to the principal of The Silve Group as compensation for the
provision of product marketing and distribution services rendered by that
company during the second quarter in connection with organizing, introducing us
to and procuring specific international sales and distribution channels, partners
and relationships.

67.     These disclosures were materially false and misleading for the reasons set forth

above.

68.     The September 30, 2007 Form 10-QSB also disclosed the receipt of purchase

orders as follows:

      a.    On September 14, 2007, Signalife received a purchase order from a
hospital/medical group purchasing organization for a finance lease for
Fidelity 100 units. The gross proceeds to Signalife, assuming exercise
of purchase rights, will be $1,980,000. Under the terms of the
purchase order, the hospital/medical group paid a $50,000 deposit
(included in accounts payable), and will prospectively pay $1,750,000
in 24 monthly lease payments (amortized on a per unit basis)
commencing upon delivery of the units, plus an additional $180,000 to
purchase the units at the end of the lease (amortized on a per unit basis
subject to certain minimums).

      b.    On September 24, 2007, Signalife received a purchase order from a
hospital/medical group purchasing organization for a finance lease for
Fidelity 100 units. The gross proceeds to Signalife, assuming exercise
of purchase rights, will be $3,300,000. Under the terms of the
purchase order, the hospital/medical group will prospectively pay a
$30,000 deposit, an additional $2,970,000 in 24 monthly lease
payments (amortized on a per unit basis) commencing upon delivery
of the units, and an additional $300,000 to purchase the units at the
end of the lease (amortized on a per unit basis subject to certain
minimums). The hospital/medical group purchasing organizations
noted above work with certain of the hospitals and medical groups we
have contacted to handle their requirements. Payments under the
above financing leases will commence upon delivery of the Fidelity
100 units. Based upon current anticipated production rates through

19

Signalife's contract manufacturer, we anticipate that the orders should be fully filled by the end of the first quarter of fiscal 2008. We intend to investigate factoring or otherwise leveraging the finance leases to accelerate cash flows from the leases. We will commence recognizing sales revenue with respect to the above orders upon shipment of the products.

c.  On October 4, 2007, Signalife received a purchase order from a hospital/medical group purchasing organization for a finance lease for Fidelity 100 units. The gross proceeds to Signalife, assuming exercise of purchase rights, will be $564,000. Under the terms of the purchase order, the hospital/medical group will prospectively pay a $12,500 deposit, an additional $514,000 in 24 monthly lease payments (amortized on a per unit basis) commencing upon delivery of the units, and an additional $50,000 to purchase the units at the end of the lease (amortized on a per unit basis subject to certain minimums). The noted hospital/medical group purchasing organization works with certain of the hospitals and medical groups we are marketing to handle their requirements. Payments under the above financing leases will commence upon delivery of the Fidelity 100 units. Based upon current anticipated production rates through Signalife's contract manufacturer, we anticipate that the orders should be fully filled by the end of the first quarter of fiscal 2008. We anticipate factoring out or otherwise leveraging the finance leases so we can recognize the full amount of lease payments associated with each unit delivered upon delivery of such unit.

69.  The September 30, 2007 Form 10-QSB also represented that: "Based upon current anticipated production rates through Signalife's contract manufacturer, we anticipate that the orders should be fully filled by the end of the first quarter of fiscal 2008."

70.  These disclosures were materially false and misleading for the reasons set forth above.

71.  On April 3, 2008, Signalife filed its 2007 Form 10-KSB with the SEC. It stated the following regarding the purchase orders referred to in the September 30, 2007 Form 10-QSB:

Initial shipment of products under the above orders were delayed until the first quarter of 2008 as a consequence of (i) the

20

discontinuance of a laptop computer to be used as part of the Fidelity 100 units, and the need to procure another laptop from another computer manufacturer that would afford comparable integrated bluetooth interoperability and other features as the discontinued Dell model, and (ii) delays by the company's contract manufacturer in setting up its manufacturing production lines.

72.     On April 14, 2008, Signalife conducted a webcast in which Defendant Harmison provided no information concerning the efforts or accomplishments of The Silve Group or Signalife's sales force, and no information concerning 2007 purchase orders or the product delivery delays discussed in the preceding paragraph. Moreover, he did not discuss 2008 first quarter sales. Although he stated that Signalife expected to realize more than $40 million of gross revenue over "the next four to five quarters," he provided no facts to support the long term projection.

73.     The silence regarding the 2007 fourth quarter delivery delay, the 2008 first quarter sales, and the results of The Silve Group's efforts, sent a message to the investing public: Signalife had experienced another quarter without making a single sale. This added credibility to the RMS assertion that "the Fidelity 100 was not commercially ready for sale." (March 31, 2007 Form 10-QSB at page 15; June 30, 2007 Form 10-QSB at page 19; September 30, 2007 Form 10-QSB at page 24). Accordingly, as a result of the webcast, Signalife's stock dropped from the previous day's closing price of $1.34 to a close of $1.17, a nearly 13% drop, with an unprecedented volume of 3,752,100 shares traded. The stock continued to decline and currently trades at roughly 5 cents.

74.     Defendants were required to cause the Company to disclose in its financial statements and news releases the material facts described herein, but Defendants failed to do so.

21

75.    Due to the pervasive mosaic of non-disclosures and deceptive disclosures, the above particularized documents which defendants caused the Company to disseminate to the investing public during the Class Period were materially (as described in SEC Staff Accounting Bulletin No. 99) false and misleading.

76.    Defendants knew and ignored, or were reckless in not knowing, the facts showing that the press releases, public statements, and filings with the SEC alleged in this complaint were materially false and misleading for the reasons set forth above.

77.    SEC Regulation S-X requires that the financial statements a public company files with the SEC conform with GAAP. Financial statements filed with the SEC that do not conform with GAAP are presumed to be misleading or inaccurate. [17 C.F.R. § 210.401 (a)(1)]. The Company's financial statements, which represented that the Company's financial position and results of operations were in conformity with GAAP, were false and misleading for the reasons alleged herein and because they constituted an extreme departure from GAAP. These financial statements violated the following GAAP concepts among others noted above:

a.    The concept that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Financial Accounting Concepts No. 1).

b.    The concept of completeness, which means that nothing material is left out of the information that may be necessary to ensure that it validly represents underlying events and conditions (FASB Statement of Financial Accounting Concepts No. 2).

22

78.    Each of the above mentioned filings with the SEC contained signed certifications by several of the Defendants that falsely alleged to be in compliance with Sarbanes-Oxley.

79.    These statements were materially false and misleading for the reasons set forth above. Moreover, each and every one of the above mentioned filings with the SEC on Form 10-KSB and on Form 10-QSB contained a materially false an misleading "Management's Discussion And Analysis Of Financial Condition And Results Of Operations" ("MDA") section because, in contravention of SEC rules and regulations, these MDA sections:

      a.    failed to comply with the requirements of SEC Financial Reporting Release (FRR) 36 which states that the MD&A should "give investors an opportunity to look at the registrant through the eyes of management by providing a historical and prospective analysis of the registrant's financial condition and results of operations, with a particular emphasis on the registrant's prospects for the future."

      b.    did not disclose known trends or uncertainties that have had, or might reasonably be expected to have, a favorable or unfavorable material effect on revenue, operating income or net income and the relationship between revenue and the costs of the revenue.

## NO SAFE HARBOR

80.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. None of the allegedly false and misleading statements pleaded herein was a forward looking statement nor were any statements identified as "forward-looking statements"

23

when made. To the extent that there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In addition, the Company issued "penny stock" within three years preceding the date of the allegedly false statements complained of here and thus Defendants are statutorily excluded from safe harbor protection. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements because at the time, each of those forward-looking statements was false or misleading and/or the forward-looking statement was authorized or approved by an Signalife executive officer who knew that these statements were false or misleading when made.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

81.    At all relevant times, the market for Signalife common stock was an efficient market following reasons, among others:

        a.    Signalife common stock met the requirements for listing, and during the Class Period, was listed and actively traded, on the American Stock Exchange ("AMEX"), a highly efficient market;

        b.    Signalife common stock was heavily traded during the Class Period, with average daily trading volumes of approximately 150,000 shares.

        c.    As a result, the market for Signalife securities promptly digested current information with respect to Signalife from all publicly-available sources and reflected such information in Signalife sock price. Under these circumstances, all purchasers of Signalife common stock during the Class Period suffered

24

similar injury through their purchase of stock at artificially inflated prices and a presumption of reliance applies.

## SCIENTER ALLEGATIONS

82.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements, issued or disseminated by or in the name of the Company were materially false and misleading; knew or recklessly disregarded that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Signalife and its business practices, their control over and/or receipt of Signalife allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Signalife were active and culpable participants in the fraudulent scheme alleged herein.   Defendants knew and /or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  This case does not involve allegations of false forward-looking statements or projections but instead involves false statements concerning the Company's business, finances and operations.  The ongoing fraudulent scheme described in this Complaint could not have been perpetrated over a substantial period of time, as has occurred, without the knowledge and complicity of the personnel at the highest level of the Company.

## LOSS CAUSATION

83.     Defendants' false statements artificially inflated the price of Signalife stock. When the truth was revealed and investors learned that Signalife may suffer heavy losses, the price of Signalife stock declined significantly.

## FIRST CLAIM

### Against All Defendants for Violation of Section 10(b) of the Exchange Act and Rule 10b-5(b) Promulgated Thereunder

84.     Plaintiff repeats and realleges each and every allegation contained above.

85.     Each of the Defendants: (a) knew or recklessly disregarded material adverse non-public information about Signalife's financial results and then existing business conditions, which was not disclosed; and (b) participated in drafting, reviewing and/or approving the misleading statements, releases, reports and other public representation of and about Signalife.

86.     These Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Signalife's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. These Defendants are also sued herein as controlling persons of Signalife, as alleged below.

87.    In addition to the duties of full disclosure imposed on Defendants as a result of their making of affirmative statements and reports, or participation in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. § 210.01 et seq.) and S-K (17 C.F.R. § 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete and accurate information.

88.    Plaintiff's losses on their purchase of the common stock of Signalife was caused by the false and misleading statements of material fact alleged herein.

89.    During the Class Period, Defendants, with knowledge of or reckless disregard for the truth, disseminated or approved the false statements specified above, which were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

90.    Defendants have violated § 10(b) of the Exchange Act Rule 10b-5(b) promulgated thereunder in that during the Class Period they made untrue statements of material facts or omitted facts  necessary in order to make statements made, not misleading.

91.    Plaintiff and Class members have suffered damage in reliance on the integrity of the market.  Plaintiff and the Class would not have purchased Signalife stock had they been aware of defendants' false and misleading statements.

## SECOND CLAIM

### Against the Individual Defendants for Violation of Section 20(a) of the Exchange Act

92.     Plaintiff repeats and realleges each and every allegation contained above.

93.     Defendants Matthews, Bunes, Scherne, Pickard, Harmison and Fink acted as controlling persons of Signalife within the meaning of Section 20(a) of the Exchange Act. By reason of their senior executive and/or Board positions, and having the power and authority to cause Signalife to engage in the wrongful conduct complained of herein.

94.     By reason of such wrongful conduct, Defendants are liable pursuant to § 20(a) of the Exchange Act. As a direct and proximate result of these defendants' wrongful conduct, plaintiffs and other members of the Class suffered damages in connection with their purchases of Signalife stock during the Class Period.

**WHEREFORE**, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure:

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees: and

D.     Such other and further relief as the Court may deem just and proper.

28

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 28 2008.

**RICHARDSON PATRICK
WESTBROOK & BRICKMAN LLC**

By: _____

Terry E. Richardson, Jr. (#3457)
E-Mail: trichardson@rpwb.com
Daniel S. Haltiwanger (#7544)
E-Mail: dhaltiwanger@rpwb.com
Walter McB. Wood (#9649)
E-Mail: wwood@rpwb.com
1730 Jackson Street
Barnwell, SC 29812
Tel:803-341-7850
Fax:803-541-9625

**VIANALE & VIANALE LLP**
Kenneth J. Vianale
2499 Glades Road, Suite 112
Boca Raton, Florida 33431
Tel: 561-392-4750
Fax: 561-392-4775

**SARRAF GENTILE LLP**
Joseph Gentile
11 Hanover Square
New York, New York 10005
Tel: 212-868-3610
Fax: 212-918-7967

*Attorneys for Plaintiffs*

29