**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**
**GREENVILLE DIVISION**

| | | |
|---|---|---|
| IN RE SIGNALIFE, INC. SECURITIES LITIGATION | : : : : : :: | Case No. 6:08-cv-02995-RBH [Consolidated Case No. 6:08-cv-3183-RBH] |

**LEAD PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS SIGNALIFE, INC., KEVIN F. PICKARD, ROBERT C. SCHERNE,
AND WILLIAM R. MATTHEWS'S MOTION TO DISMISS PLAINTIFFS'
<u>CONSOLIDATED CLASS ACTION COMPLAINT</u>**

## **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................................... 1

SUMMARY OF ALLEGATIONS ................................................................................................. 2

I.  Defendants Caused Signalife to Issue Materially
    False and Misleading  Statements Concerning Its Heart Monitors...................................... 2

II.  On April 14, 2008, Investors Learned that Signalife Had
     Not Generated Any Sales or Revenues from the Sale of Its
     Flagship Fidelity 100 Device. ............................................................................................. 4

ARGUMENT................................................................................................................................... 6

I.  Plaintiffs Have Stated a Claim for Relief Under
    Section 10(b) and Rule 10b-5 ............................................................................................. 6

    A.  The Standard for Deciding a Motion to Dismiss ........................................................ 6

    B.  The Facts Alleged and the Inferences Reasonably Derived
        Therefrom Allow for a Cogent and Compelling Inference of
        Defendants' Scienter ................................................................................................... 6

        1.  Defendants Had Actual Knowledge that Their
            Statements Concerning the Market Readiness of the
            Fidelity 100 and Stein's Role with the Company Were
            False and Misleading ........................................................................................ 8

        2.  The Individual Defendants Acted on Their Motive and
            Opportunity to Defraud the Market by Manipulating
            Signalife's Stock Price .................................................................................... 13

        3.  Plaintiffs' Confidential Witnesses Are Pleaded with
            Ample Particularity and Their Statements Produce a Strong
            Inference of Scienter ...................................................................................... 14

    C.  The Complaint Adequately Pleads Loss Causation .................................................. 17

    D.  Defendants' Allegedly Accurate Statements Were False or Misleading...................... 19

    E.  Defendants' Misrepresentations Were Material ........................................................ 21

II.  The PSLRA's Safe Harbor Provision Provides No Protection ......................................... 23

i

A.  Defendants' Safe Harbor Argument Involves a Question of
Fact that Is Not Appropriate to Raise on a Motion to Dismiss. ..................................... 23

B.  Defendants' Boilerplate Disclaimers Are Not Meaningful
Cautionary Language ................................................................................................... 24

C.  Defendants' Statements Are Not Protected by the Safe Harbor
Because They Were Knowingly False When Made ...................................................... 25

III.  The Complaint Adequately Pleads Violations of Section 20(A) ....................................... 27

CONCLUSION ............................................................................................................................... 28

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Asher v. Baxter Int'l, Inc.,*
    377 F.3d 727 (7th Cir. 2004) ................................................................................................23

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544, 127 S.Ct. 1955 (2007).............................................................................. *passim*

*Blatt v. Corn Prods. Int'l, Inc.,*
    2006 WL 1697013 (N.D. Ill. June 14, 2006)...................................................................23, 24

*City of Hialeah Employees' Ret. Sys. & Laborers
Pension Trust Funds v. Toll Brothers, Inc.,*
    2008 WL 4058690 (E.D. Pa. Aug. 29, 2008) ........................................................................25

*Cozzarelli v. Inspire Pharmaceuticals Inc.,*
    549 F.3d 618 (4th Cir. 2008) ...................................................................................................7

*Dura Pharm., Inc. v. Broudo,*
    544 U.S. 336 (2005)..........................................................................................................6, 17

*Epstein v. Itron, Inc.,*
    993 F. Supp. 1314 (E.D. Wash. 1998)....................................................................................9

*Florida State Bd. of Admin. v. Green Tree Fin. Corp.,*
    270 F.3d 645 (8th Cir. 2001) ...................................................................................................9

*Grossman v. Novell, Inc.,*
    120 F.3d 1112 (10th Cir. 1997) .............................................................................................24

*In The Matter Of Caterpillar, Inc., Respondent,*
    No. 3- 7692, 50 S.E.C. 903 (Mar. 31, 1992)....................................................................19, 20

*In re Aetna Inc. Sec. Litig.,*
    34 F. Supp. 2d 935 (E.D. Pa. 1999) ......................................................................................10

*In re Ancor Commc'ns, Inc.,*
    22 F. Supp. 2d 999 (D. Minn. 1998)........................................................................................9

*In re Burlington Coat Factory Sec. Litig.,*
    114 F.3d 1410 (3d Cir. 1997)................................................................................................22

*In re Campbell Soup Sec. Litig.,*
    145 F. Supp. 2d 574 (D.N.J. 2001) .......................................................................................22

*In re Daou Sys., Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) ................................................................15

*In re Datastream Sys., Inc. Sec. Litig.*,
   No. 6:99-0088-13, 2000 WL 33176025 (D.S.C. Jan. 27, 2000) ............................................13

*In re Humphrey Hospitality Trust, Inc. Sec. Litig.*,
   219 F. Supp. 2d 675 (D. Md. 2002) ......................................................................26

*In re Lab Corp. of Am. Holdings Sec. Litig.*,
   2006 WL 1367428 (M.D.N.C. May 18, 2006) ......................................................24

*In re Microstrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E.D. Va. 2000) ..............................................................22, 27

*In re Royal Ahold N.V. Sec. & ERISA Litig*,
   351 F. Supp. 2d 334 (D. Md. 2004) ......................................................................27

*In re Sears, Roebuck and Co. Sec. Litig.*,
   291 F. Supp. 2d 722 (N.D. Ill. 2003) ...................................................................10

*In re Silicon Graphics, Inc. Sec. Litig.*,
   183 F.3d 970 (9th Cir. 1999) ...............................................................................9

*In re Time Warner Inc. Sec. Litig.*,
   9 F.3d 259 (2d Cir.1993)......................................................................................13

*In re Vicuron Pharm., Inc. Sec. Litig.*,
   No. 04-2627, 2005 WL 2989674 (E.D. Penn. July 1, 2005) ....................................10

*In re WorldCom, Inc. Sec. Litig.*,
   294 F. Supp. 2d 392 (S.D.N.Y. 2003) ................................................................27

*Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*,
   403 F.3d 1050 (9th Cir. 2005) ............................................................................23

*Lormand v. U.S. Unwired, Inc.*,
   No. 07-30106, 2009 WL 941505 (5th Cir. April 9, 2009).................................17, 26

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
   437 F.3d 588 (7th Cir. 2006) ...........................................................................7, 16

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)..............................................................................9, 16

*Oran v. Stafford*,
   226 F.3d 275 (3d Cir. 2000)................................................................................22

*Ottmann v. Hanger Orthopedic Group, Inc.,*
  353 F.3d 338 (4th Cir. 2003) ...................................................................................6, 9

*Phillips v. LCI Int'l, Inc.,*
  109 F.3d 609 (4th Cir. 1999) ........................................................................................9

*Phillips v. LCI Int'l, Inc.,*
  *190 F.3d 609* (4th Cir. 1999) ........................................................................................7

*Rodriguez-Ortiz v. Margo Caribe, Inc.,*
  490 F.3d 92 (1st Cir. 2007)..........................................................................................16

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,*
  75 F.3d 801 (2d Cir.1996)............................................................................................13

*Shaw v. Digital Equip. Corp.,*
  82 F.3d 1194 (1st Cir. 1996)........................................................................................23

*South Ferry LP, No. 2 v. Killinger,*
  542 F.3d 776 (9th Cir. 2008) ...................................................................................7, 10

*Teachers' Ret. Sys. of La. v. Hunter,*
  477 F.3d 162 (4th Cir. 2007) ......................................................................6, 15, 16, 19

*U.S. S.E.C. v. Sierra Brokerage Services, Inc.,*
  No. C2-03-CV-326, 2009 WL 828242 (S.D. Ohio Mar. 31, 2009)...........................13

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  § 78j(b)...................................................................................................................6, 10
  § 78t-1.................................................................................................................27, 28
  § 78u-4(b)(2)................................................................................................................7
  § 78u-5(c)(1)(A)-(B)..................................................................................................26

17 C.F.R.
  § 240.10b-5 .................................................................................................................6

F.R.C.P.
  Rule 8(a)(2).................................................................................................................17
  Rule 8........................................................................................................................28
  Rule 9:.......................................................................................................................17
  Rule 9(b)....................................................................................................................28

**INTRODUCTION**

This is a relatively straight-forward case in which the top executives at Defendant Signalife Inc. ("Signalife") knowingly participated in a fraudulent scheme to artificially manipulate and inflate Signalife's stock price. Specifically, from February 10, 2004 through April 14, 2008 (the "Class Period"), the top executives at Signalife knowingly and fraudulently misstated the commercial viability of Signalife's flagship product, the Fidelity 100. The Fidelity 100 was a heart monitoring device that was designed to transmit data to a physician for medical review. During the Class Period, Signalife's top executives repeatedly stated that the Fidelity 100 was ready to market to physicians and was a commercially viable product when they knew that the Fidelity 100 was still in its early development stage. Signalife's executives also falsely stated that the Company was making a number of sales to physicians and hospitals when they knew that no such sales had occurred. Additionally, Signalife's executives falsely stated that the Company was earning revenues from sales of the Fidelity 100 when no such revenues had been earned. These statements were knowingly false and violated the federal securities laws.

Indeed, unbeknownst to the market, Signalife had never produced a fully-functional, saleable Fidelity 100. Signalife's top executives all knew that their flagship product was not market ready, and they knew that the Fidelity 100 had not earned the Company any revenues. Nevertheless, these executives continued to tout the product's commercial readiness and viability and they continued to state that the Company was already earning revenues from the Fidelity 100 sales. The truth about the Company and the Fidelity 100 emerged on April 14, 2008 when the market learned that Signalife had not earned any revenues from the sale of its heart monitoring devices. As a result, the price of Signalife's stock fell significantly. Signalife's stock was later

1

delisted from the American Stock Exchange ("AMEX") and now trades as a penny stock on the Over-The-Counter Bulletin Board, referred to as the Pink Sheets.[1]

## SUMMARY OF ALLEGATIONS

The Complaint asserts claims under the Securities Exchange Act of 1934 on behalf of purchasers of publicly traded securities of Signalife who purchased such securities during the Class Period. (¶ 1)[2]. In order to mislead investors about Signalife's products and business prospect, and to manipulate its stock price, Signalife's top executives engaged in a company-wide scheme to knowingly and systematically make several positive statements concerning the development of the Company's heart monitors. (¶¶ 3-18, 28). This stock manipulation scheme came to light during the April 14, 2009 webcast in which Signalife's Chairman and Chief Executive Officer, Dr. Lowell Harmison, failed to report any revenue from the sales of the Fidelity 100, despite numerous assurances that revenue would be recognized by the first quarter of 2008 at the latest. (¶¶ 3, 18, 73, 85-86) (*see also* (Def. Ex. 29 at 18). This caused Signalife's stock price to drop over 13%. (*Id.*).

## I.    Defendants Caused Signalife to Issue Materially False and Misleading Statements Concerning Its Heart Monitors

Throughout the Class Period, Defendants falsely represented to investors that Signalife had developed a "revolutionary" heart monitor that used proprietary, patented "amplification" technology to collect physiological data for electrocardiogram ("ECG") tests. (¶¶ 3, 8). These heart monitors combined with "Bluetooth" technology were said to enable a patient's heart to be continuously monitored in a variety of clinical settings over a period of 24 to 48 hours and to

---

[1]    Plaintiffs incorporate by reference all of the arguments made in their Opposition to Defendants Bunes' and Harminson's motions to dismiss.

[2]    All ¶ and ¶¶ references are to Plaintiffs' Consolidated Class Action Complaint filed December 10, 2008 (amended on February 24, 2009 to add Defendants Stein and Drakulic to the caption).

2

transmit the physiological data to a personal computer for analysis and storage. (¶¶ 3, 44). Starting in 2004, Defendants began misleading investors by reporting that the Company was making progress toward the production of a saleable Fidelity 100. For instance, in December 2004, the Company claimed the production of the Fidelity 100 was "ahead of schedule" (¶48), while in May 2005, the Company assured investors that the Fidelity 100 device would be sold in late 2005. (¶ 50). As late as November 2005, the Company announced that the Fidelity 100 would "be manufactured and commercially available for sale in the first week of December 2005." (¶ 52). In reality, despite such false positive statements, no products were commercially available and no sales were made in 2005. In fact, former Signalife President and Board member Steven O. Sparks ("Sparks") stated that "the Fidelity 100 [in all probability [would] not be ready for market for several years." Def. Brf. at 13.

On March 26, 2006, Signalife continued its false and misleading statements concerning the Fidelity 100 when it announced the imminent "roll out" of the Fidelity 100 heart monitor and the execution of an exclusive sales and marketing agreement with Rubbermaid Medical Solutions ("Rubbermaid"). (¶¶ 8, 55, 57, 59). The Rubbermaid contract turned out to be a disaster for Signalife. By January 2007, Rubbermaid concluded that the Fidelity 100 was nowhere close to being commercial ready to take to market and the Company terminated its contract with Signalife. In addition, Rubbermaid filed a breach of contract action against Signalife alleging that the Fidelity 100 was not commercially ready for sale and that none of the Fidelity sales Signalife reported in October 2006 had actually occurred. (¶¶ 9, 58, 61-66).

The *Rubbermaid* lawsuit, however, did not stop Defendants from making additional false and misleading statements about the commercial readiness of its flagship product. Rather, the Company made additional false statements touting their successful sales efforts between the

3

Second Quarter 2007 and the Fourth Quarter 2007 to artificially inflate the Company's stock upward and avoid being delisted from AMEX. (¶¶ 12, 66-68, 70, 72-73, 75-77). Specifically, the Company announced purchase orders from Mexican physicians (¶ 68), as well as $500 million worth of orders that were "*currently resulting in revenues to the company such that the company anticipates achieving break-even status by the end of January, 2008, or at the very latest the end of 2008 first quarter.*" (¶¶ 11, 73).

On November 14, 2007, the Company announced over $5.7 million worth of additional purchase orders. (¶¶11, 75). In March 2008, Defendants announced an additional $7.5 million in Fidelity 100 purchase orders and that the Company was "*actively shipping orders.*" (¶¶ 14, 81, 82). In connection with such orders, Defendant Harmison stated, "I am very comfortable with our production line capabilities in terms of their immediate capacity." (¶ 81). Despite supposed manufacturing delays, Defendants continued to assure investors as late as April 3, 2008 that the Company had commenced shipping units under the above orders in the first quarter of fiscal 2008, which would result in revenue being recognized under Signalife's revenue recognition policy. *See* ¶ 82 and Def. Ex. 29 at 17, 18.

**II.    On April 14, 2008, Investors Learned that Signalife Had Not Generated Any Sales or Revenues from the Sale of Its Flagship Fidelity 100 Device**

It was not until the Company's April 14, 2008 webcast that investors learned that these statements were false. During the April 14, 2008 webcast, Defendants shocked investors when Harmison failed to provide any revenue updates or purchase order. (¶¶ 17, 85). Harmison's failure to provide any information on the Company's sales and revenues during the April 14 webcast did not square with the statements the Company had made in its April 7, 2008 press release announcing the webcast. In that release, the Company stated:

4

> **Signalife, Inc. (Amex: SGN - News)** has confirmed that it
> has filed its form 10-KSB, and the company's Chairman and Chief
> Executive Officer, Dr. Lowell T. Harmison, has scheduled a
> webcast on April 14, 2008, at 10:00 a.m. EST.
>
> Dr. Harmison stated: "Now that Signalife has closed filing the
> company's form 10-KSB and *the Company is manufacturing and
> shipping product, I am pleased to provide direction on new
> contracts, pending orders and production, various product
> initiatives (from the Fidelity 100 to the prospective industry-wide
> application of the Fidelity 1000 module)*, and the Athletes For
> Life partnership, as well as such issues as the Company's
> immediate, positive financial prospects as well as several other
> initiatives that have now been completed. The webcast will be
> broadcast from a studio and will be attended by representatives of
> Athletes for Life Foundation and selected invited members of the
> business press. To the extent time permits, I will answer questions
> following my presentation. I urge all persons following the
> company to view the webcast."

Guglielmo Decl., Ex. 21

When Harmison said nothing about the Company's sales and revenues from the Fidelity
100 during the April 14, 2008 call, investors recognized that they had been misled and
Signalife's stock price plunged 13% that day. Subsequently, the stock price continued to dive
further downward resulting in AMEX delisting the stock. (¶¶ 17, 85-87). The stock now trades
as a penny stock. (¶¶ 6, 87). Additional facts which came to light after the Class Period and
which were alleged in the Complaint include the fact that Defendant Harmison confirmed the
fraudulent scheme to a confidential witness (hereafter, "CW#2") when Harmison admitted that
millions of dollars in sales orders reported by Signalife in press releases and SEC filings did not
exist. (¶¶ 4, 18, 43).

In fact, as of September 30, 2008 (well after the Class Period), the Company did not
recognize any revenue from any purported purchase orders it had announced during the Class
Period. *See* Def. Ex. 34 at 3. Moreover, the various products, including the Fidelity 300 Holter

Monitor and Fidelity 200 HeartTempo Card, that were purportedly "developed" and/or would imminently be ready for market are still not saleable products. (¶¶ 18, 89). Moreover, Harmison claimed ignorance to CW#2 about the press releases announcing the sales and asserted that he somehow had not been responsible for their issuance. (¶¶ 18, 43). Post-Class Period revelations confirm that Defendants knew that Signalife never had any products to sell, did not make any sales that produced any revenue and was little more than a stock manipulation scheme, perpetrated by Defendant Mitchell Stein, including by and through a succession of Signalife executive officers. (*Id.*).

## ARGUMENT

### I.    Plaintiffs Have Stated a Claim for Relief Under Section 10(b) and Rule 10b-5

#### A.    The Standard for Deciding a Motion to Dismiss

Under §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, it is unlawful for any person, directly or indirectly, to commit fraud in connection with the purchase or sale of securities. 15 U.S.C. §78j(b); 17 C.F.R. §240.10b-5. A securities fraud plaintiff must show that: "(1) the defendant made a false statement or omission of material fact (2) with scienter (3) upon which the plaintiff justifiably relied (4) that proximately caused the plaintiff's damages." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 (4th Cir. 2007) citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005).

#### B.    The Facts Alleged and the Inferences Reasonably Derived Therefrom Allow for a Cogent and Compelling Inference of Defendants' Scienter

In their papers, Defendants argue that Plaintiffs have failed to sufficiently allege scienter. "In a securities fraud action, the term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 344 (4th Cir. 2003); *Pearce*, 2003 WL 25518056, at *4. To allege scienter, "[t]he PSLRA

directs that a complaint must, 'with respect to each act or omission alleged to violate the chapter, state with particularity facts giving rise to a strong inference that defendant acted with the required state of mind.'" *Phillips v. LCI Int'l, Inc.,* 190 F.3d 609, 620 (4th Cir. 1999).

In *Tellabs,* 127 S. Ct. 2499, the United States Supreme Court set forth the proper standard for determining whether a plaintiff has alleged a "strong inference" of scienter under § 21D(b)(2) of the PSLRA, 15 U.S.C. § 78u-4(b)(2). The Court explained that a securities fraud complaint should be sustained if the inferences supporting scienter are "cogent and *at least as* compelling as any opposing inference[s] of nonfraudulent intent."[3] *Id.* at 2505. In addition, the Supreme Court explicitly rejected the "most plausible" standard, which required the inference of scienter to be the most plausible of all possible inferences drawn from the facts. ("The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the 'smoking-gun' genre, *or even the 'most plausible of competing inferences.'"). Id.*

The *Tellabs* Court went on to emphasize throughout its opinion that a plaintiff's scienter allegations must be taken collectively and assessed holistically. The Fourth Circuit has recognized that a securities complaint should not decide the issue of scienter by viewing individual allegations in isolation. *Cozzarelli v. Inspire Pharmaceuticals Inc.,* 549 F.3d 618, 625 (4th Cir. 2008) (citing *Tellabs,* 127 S.Ct. at 2509 ("all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard'"); *see also South Ferry LP, No. 2 v. Killinger,* 542 F.3d 776, 784 (9th Cir. 2008); (*Tellabs* held that omissions and ambiguities are properly considered; thus, "*Tellabs* counsels us to consider the totality of circumstances, rather than to develop separately rules of thumb for each type of scienter allegation.).

---

[3]        Unless otherwise noted all emphasis is added and citations omitted.

Here, Plaintiffs have alleged that each Individual Defendant knew or recklessly disregarded and should have known that Signalife's statements were false and misleading. Indeed, the Fidelity 100 was Signalife's flagship product – the medical device around which the entire Company was built – and, thus, it simply is not plausible that Signalife's top executives would not have known that the product was not generating any sales or revenues. They had to have known – or if they did not know, they were reckless in not knowing that the Fidelity 100 had not generated any sales or revenues – because the fate of the Company and their own personal livelihoods rested entirely on Signalife's ability to take the Fidelity 100 to market and generate meaningful sales and revenues. Plaintiffs have further alleged that each Individual Defendant was alerted to the falsity of their statements concerning Signalife's core business operations through their personal involvement in the Company's executive management, product development and marketing teams. Plaintiffs also provided Harmison's own statements and admissions through Confidential Witnesses confirming his knowledge of the fraudulent conduct which occurred during the Class Period. Considered collectively, these allegations, which detail intentional misconduct and recklessness on the part of Defendants, give rise to an inference of scienter that is at least as plausible as any competing inference.

### 1. Defendants Had Actual Knowledge that Their Statements Concerning the Market Readiness of the Fidelity 100 and Stein's Role with the Company Were False and Misleading

Defendants' scienter can be further inferred from the allegations in the Complaint that establish that Defendants had *actual knowledge* that the Fidelity 100 was not ready for the market and would prevent the Company from recognizing the reported revenue from the purported purchase orders announced during the Class Period. As noted above, it would be absurd for the Individual Defendants, in their executive positions, not to know the truth about

8

these core business operations. The statements made by Defendants were at the very least reckless under Fourth Circuit law because they were highly unreasonable and such an extreme departure from the standard of ordinary care that had the effect of materially misleading investors about the Company's one and only product, future business prospects and management team. *Phillips v. LCI Int'l, Inc.*, 109 F.3d 609, 613 (4th Cir. 1999) (defining recklessness as "an act so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it").

A strong inference of scienter may be drawn where the defendants are alleged to have known facts or to have had access to information suggesting that their public statements were not accurate when made. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). Such an inference can also arise where the defendants have failed to check information they had a duty to monitor. *Id.* As noted above, a defendant's reckless behavior also satisfies the scienter element of a Section 10(b) claim. *Phillips*, 109 F.3d at 613; *Ottman*, 353 F.3d at 344; *Florida State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001) (facts that defendants "had access to information suggesting that their public statements were materially inaccurate" indicates scienter); *Novak*, 216 F.3d at 308 ("[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements.").

To this end, a company's top executives are presumed to know facts critical to the business's core operations and products. *See, e.g., In re Ancor Commc'ns, Inc.*, 22 F. Supp. 2d 999, 1005 (D. Minn. 1998) ("'[F]acts critical to a business's core operations or *an important transaction* generally are so apparent that their knowledge may be attributed to the company and

9

its key officers.'") (emphasis in original); *Epstein v. Itron, Inc.*, 993 F. Supp. 1314, 1326 (E.D. Wash. 1998), *abrogated on other grounds by In re Silicon Graphics, Inc. Sec. Litig.*, 183 F.3d 970, 974 (9th Cir. 1999) (same); *In re Aetna Inc. Sec. Litig.*, 34 F. Supp. 2d 935, 953 (E.D. Pa. 1999) (finding knowledge imputed to key officials of problems with "core business"); *In re Vicuron Pharm., Inc. Sec. Litig.*, No. 04-2627, 2005 WL 2989674, at *7 (E.D. Penn. July 1, 2005) (the Company's "lead product in development, and its importance to the company supports at least a strong inference of recklessness of all the company's officers and directors named as defendants"); *In re Sears, Roebuck and Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (officers of a company can be assumed to know of facts "critical to a business's core operations or to an important transaction that would affect a company's performance"). In light of *Tellabs*, this core operations inference can be a relevant part of a complaint that raises a strong inference of scienter. *South Ferry*, 542 F.3d at 784. "Allegations regarding management's role in a corporate structure and the importance of the corporate information about which management made false or misleading statements may also create a strong inference of scienter when made in conjunction with detailed and specific allegations about management's exposure to factual information within the company." *Id.* at 785-86 (allegations of management's role may independently satisfy the PSLRA scienter requirement when "the nature of the relevant fact is of such prominence that it would be 'absurd' to suggest that management was without knowledge of the matter").

Defendants argue that a defendant's title or role with a company does not raise a strong inference of scienter.    (Def. Brf. at 21-22) (Harmison Brf. at 13), (Bunes Brf. at 12). Conveniently, Defendants ignore the fact that Plaintiffs alleged more than that. Plaintiffs alleged that Defendants, in addition to their roles as top executives at the Company, possessed the

requisite scienter because the false and misleading statements involved Signalife's core business operations – the Fidelity 100 – and Stein's role in controlling the Company's operations – facts that these Individual Defendants were knowledgeable about and which they were intimately involved in. (¶¶ 91-92).

Plaintiffs have explicitly pled that the Individual Defendants were not only Signalife's top executive officers with full access to material information about the Company and its products (¶¶ 34-40), but also that each Individual Defendant had actual, conscious knowledge of the development, manufacturing, and sale orders of the Fidelity 100 – the Company's flagship product. (¶ 92). Individual Defendants' knowledge about all aspects of the Fidelity 100 and the false sales associated therewith can be presumed because of their positions, as well as the fact that the Fidelity 100 was the Company's primary product. In fact, although Signalife also maintained it was developing other products based on the Model 100 technology that Defendants continually asserted were on the precipice of being market-ready (¶¶ 79, 83), the only product based on the Model 100 technology that Signalife claimed to have successfully brought to market during the Class Period was the Fidelity 100. (¶¶ 3, 84).

Plaintiffs' Complaint cites to numerous additional false and misleading statements concerning the development, manufacturing and sales of the Company's flagship product that Individual Defendants knew to be false, and/or were reckless in making. (¶¶ 45, 47-50,-52, 55, 58-59, 61-63, 66-68, 72-73, 75-77, 80). Indeed, Defendants admit that there were issues raised about the development and manufacturing of the Fidelity 100 that they claim investors should have known but which were not disclosed during the Class Period. (Def. Brf. at 13). It would be illogical to suggest the Defendants, themselves, in their executive positions and with their access to information, did not know the truth about the significant problems facing the development of

11

the Fidelity 100 and their failure to consummate any of the previously announced sales.  (¶¶ 66, 82).

For instance, Harmison served as a member of the Board of Directors since 2003 and served as CEO from March 2005 to July 2005, and again from August 2007 to May 2008.  (¶ 36).  Based on these positions and the importance of the Fidelity 100, Harmison could be presumed to have had knowledge of the falsity and misleading nature of all of the Fidelity 100 statements.  In fact, as further support for Plaintiffs' establishment of scienter as to Defendant Harmison, Plaintiffs have set forth the statements from CW#2 who confirmed that Harmison knew about the problems facing the Fidelity 100 and that the statements about the customer orders were false and misleading.  (¶¶ 4, 18, 88).

Likewise, Plaintiffs' allegations of scienter as to Defendants Pickard, Scherne and Drakulic are equally cogent given that they also held top executive positions throughout the Class Period and would have had knowledge of these false statements concerning the Fidelity 100.  (¶¶ 37-39).  Moreover, it would be "absurd" to claim that Defendant Drakulic did not know the truth about the Fidelity 100 because he developed the Model 100 technology and was Chief Technology Officer throughout the Class Period.  (¶ 39).

The Complaint also sets forth specific allegations concerning Defendant Bunes' knowledge and/or recklessness.  The Complaint specifically alleges that between April 2005 and August 2007, Defendant Bunes "provided leadership with the sale and marketing of Signalife's products."  (Bunes Brf. at 4).  Therefore, given Defendant Bunes' position as CEO and admitted leadership with the sale and marketing of Signalife's products, she clearly had all of the critical information concerning the Fidelity 100 supporting the establishment of a strong inference of scienter as to Defendant Bunes.  (*See* ¶¶ 35, 49-50,-52, 55, 58-59, 61-63, 66-68).

12

### 2.    The Individual Defendants Acted on Their Motive and Opportunity to Defraud the Market by Manipulating Signalife's Stock Price

Plaintiffs' pleadings also support a strong inference of scienter by establishing that Defendants had the motive and opportunity to implement a massive scheme to manipulate the Company's stock price. A strong inference of scienter may be supported by establishing "a motive to commit fraud and an opportunity to do so." *In re Datastream Sys., Inc. Sec. Litig.n*, No. 6:99-0088-13, 2000 WL 33176025, at *3 (D.S.C. Jan. 27, 2000),[4] First, because of top executive positions each Individual Defendant held during the Class Period (¶¶ 35-40), Plaintiffs have effectively alleged that each Defendant had the opportunity to manipulate the stock price and defraud Plaintiffs. *See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos., Inc.,* 75 F.3d 801, 813 (2d Cir.1996) (indisputable that key directors and officers have ability to manipulate their company's stock price); *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 268 (2d Cir.1993) (same).

Second, the Complaint alleges that Defendants were motivated to make the false and misleading statements described in the Complaint to manipulate the Company's stock price to (1) avoid and delay being delisted from the American Stock Exchange and being sold as a penny stock (¶¶ 6, 10, 12, 70 78, 87); *see U.S. S.E.C. v. Sierra Brokerage Services, Inc.,* No. C2-03-CV-326, 2009 WL 828242, at *39 (S.D. Ohio Mar. 31, 2009) (manipulative market activity to inflate market price for the purpose of preventing it from being traded as a penny stock supports a finding of scienter); and (2) to advance Defendant Stein's stock manipulation and shorting scheme because they were controlled by Stein, who determined who received Signalife shares,

---

[4]    In *Tellabs*, the Supreme Court considered whether the absence of motive allegations negate the inference of scienter: "[w]hile it is true that motive can be a relevant consideration, and personal financial gain may weigh heavily in favor of a scienter inference, we agree with the Seventh Circuit that *the absence of a motive allegation is not fatal*." *Tellabs*, 127 S. Ct. at 2511. At bottom, "allegations must be considered collectively; the significance that can be ascribed to an allegation of motive, or lack thereof, depends on the entirety of the complaint." *Id.*

dictated who served on the Board, and hired and fired the Company's executives. (¶¶ 5, 19, 21-22, 34, 91); *see also* Def. Ex. 14, ¶ 32. In addition, Defendants incorrectly argue that they are insulated from an inference of scienter because they did not sell any Signalife stock during the Class Period. This is incorrect. Indeed, it is well established that insider trading allegations are not required to establish scienter. *See Tellabs,* 127 S. Ct. at 2511 (insider sales supports a strong inference of scienter, but is not mandatory for a finding that Defendants acted with scienter when making false statements about their company).

### 3.    Plaintiffs' Confidential Witnesses Are Pleaded with Ample Particularity and Their Statements Produce a Strong Inference of Scienter

Unable to rebut the Complaint's detailed allegations showing that Defendants had actual knowledge that the Company had no means to manufacture or market any kind of saleable Fidelity 100 devices as represented and that Stein actively participated in controlling and managing the Company, Defendants ask this Court to disregard the confidential witnesses' statements and attempt to discredit each of Plaintiffs' confidential witnesses. (Def. Brf. at 17-21; Harmison Brf. at 20-22). However, it is clear that each of these witnesses have provided first-hand knowledge of the information and events they reported and each are described with sufficient particularity to satisfy the requirements of the PSLRA. The Complaint also provides corroborative information supporting both the accuracy and reliability of the information provided by the confidential sources. Nothing more is required at the pleading stage.

The Complaint cites to two confidential witnesses, both of whom satisfy all of the relevant criteria that courts typically look to when determining that confidential sources are, in fact, reliable. When a complaint relies on confidential sources, it must describe "with sufficient particularity 'to support the probability that a person in the position occupied by the source

14

would possess the information alleged' *or* in the alternative provide other evidence to support their allegations." *Teachers' Ret. Sys.*, 477 F.3d at 174 (citing *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006). Indeed, "[s]o long as plaintiffs reveal with particularity the sources of their information, the complaint will survive under the PSLRA." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005).

Here, the Complaint specifies that CW#1 was an independent contractor with Signalife and was hired by Stein, without the CEO's approval. (¶¶ 19, 42). The fact that CW#1 did not speak or otherwise interact with the Company's CEO before being hired by Stein, supports CW#1's assertion that "[n]othing happens at Signalife without Stein's okay." *Id.* CW#1's claim that Stein controlled the Company is reliable because it is corroborated by Mr. Sparks (¶¶ 19, 20, 34), Mr. Fink (Def. Brf. at 12) and CW#2 (¶¶ 19, 23, 34, 43). CW#1 also stated that Stein was manipulating the Company stock price and "shorting" the stock. (¶¶ 22, 42). This claim is also reliable because it is corroborated by Mr. Sparks (¶¶ 19-22, 34) and CW#2 (¶¶ 19, 22, 43).

CW#2, a significant Signalife investor (¶¶ 19,43), also stated that Stein controlled the Company (¶¶ 19, 23, 34, 43), which was corroborated by Mr. Sparks (¶¶ 19, 20, 34), Mr. Fink (Def. Brf. at 12) and CW#1 (¶¶19, 34, 42), and that Stein was manipulating the Company's stock price, by using shares transferred to "blind trusts" by ARC Finance (¶¶ 19, 22, 43), which was also corroborated by Mr. Sparks' testimony (¶¶ 19-22, 34) and CW#1 (¶¶ 22,42), as well as the Company's own Form 14A filings that confirmed the existence of these blind trusts. (¶¶ 60, 69). Significantly, CW#2 also stated that after the April 14, 2008 webcast, Harmison, who was, at the time, and remains CEO of the Company, admitted that millions of dollars in sales orders reported by Signalife in press releases and SEC filings did not exist.[5]  (¶¶ 4, 18, 88).  The Complaint

---

[5]     Regrettably, in a desperate attempt to distract the Court from the substantive allegations against Defendants, Defendants resort to attacking CW#2's character by making wild accusations that CW#2 potentially

clearly identifies the source of CW#2's first-hand knowledge to be Harmison. *Id.* The Complaint supports the reliability of these witnesses' statements, therefore Plaintiffs' confidential sources do help support a strong inference of scienter against Defendants.

Moreover, Defendants' argument that the Court cannot rely on the information attributed to such confidential witnesses mischaracterizes the law of this Circuit. Specifically, in *Teachers' Retirement System of Louisiana v. Hunter*, 477 F.3d 162 (4th Cir. 2007), the Court relied upon the Seventh Circuit's decision in *Makor Issues & Rights Ltd. v. Tellabs, Inc.,* 437 F.3d 588, 595 (7th Cir. 2006) which, in turn, relied on the Second Circuit's holding in *Novak v. Kasaks*, 216 F.3d 300, 314 n.1 (2d Cir. 2000), that stated: "We agree with our colleagues that it would be too much to require plaintiffs to provide 'name, rank, and serial number' for each of these sources. They must, however, describe their sources with sufficient particularity 'to support the probability that a person in the position occupied by the source would possess the information alleged,'" *citing Novak*, 216 F.3d at 314. Thus, contrary to Defendants' arguments, Plaintiffs' confidential witnesses may be relied upon by the Court in establishing an inference of scienter. Here, Plaintiffs have provided sufficient information to support that probability that the individuals would have possessed the information at issue. (¶¶ 4, 18, 22, 23, 34, 42-43, 88).

Furthermore, contrary to the Harmison's argument (Harmison Brf. at 13), Plaintiffs' allegations concerning Post-Class Period events, including CW#2's statements, does not amount to "fraud by hindsight"; that is, it does not "infer[ ] earlier knowledge based only on the situation that later came to pass." *Rodriguez-Ortiz v. Margo Caribe, Inc*., 490 F.3d 92, 95 (1st Cir. 2007). Here, Harmison's admitted to CW#2 after the Class Period that the orders and sales during the Class Period did not exist. (¶¶ 88-89) Despite the announcement of millions of dollars in sales

---

committed an illegal act by either trading on this inside information or by not reporting fraudulent activity to regulatory or criminal authorities. (Def. Brf. at 20 n.17). This unsubstantiated and desperate attack on CW#2's character is meritless and has no bearing on a 12(b)(6) motion to dismiss and should be ignored by the Court.

and the purported recognition of revenue from such sales, Harmison confirmed that such prior statements were knowingly fraudulent. Such facts, directly and cogently tend to prove Defendants' state-of-mind at the time of their misleading statements and omissions, *i.e.*, they are evidence that the Defendants actually knew earlier that the Company's core business operations would turn out badly. Thus, these statements can be considered in establishing a strong inference of scienter.

### C. The Complaint Adequately Pleads Loss Causation

Defendants go on to argue that Plaintiffs have failed to plead "loss causation." To plead loss causation, "[t]he plaintiff must prove ... that the untruth was in some reasonably direct, or proximate, way responsible for his loss. The causation requirement is satisfied in a Rule 10b-5 case only if the misrepresentation touches upon the reasons for the investment's decline in value." *Datastream Sys.*, 2000 WL 33176025, at *3. "To satisfy the pleading requirement, plaintiffs must simply allege "a causal connection between the deceptive acts that form the basis for the claim of securities fraud and the injury suffered." *Id.*

In *Dura*, the Supreme Court made it clear that the standard for pleading loss causation is Rule 8, which requires only "a short and plain statement of the claim," not the particularity that is required by Rule 9: *DuraPharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 346 (2005). The Supreme Court in *Twombly* explained that "Rule 8(a)(2) requires the plaintiff to allege, in respect to loss causation, a facially "plausible" causal relationship between the fraudulent statements or omissions and plaintiff's economic loss." *Lormand v. U.S. Unwired, Inc.*, No. 07-30106, 2009 WL 941505, at *26 (5th Cir. April 9, 2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556, 127 S.Ct. 1955, 1965 (2007)). The complaint must allege enough facts to give rise to a reasonable hope or expectation that discovery will reveal evidence of loss causation.

17

The Complaint specifically alleges that once the April 14, 2008 webcast provided notice to investors that Signalife's flagship product was not commercially ready for sale and that the tens of millions of dollars in purchase orders – some only announced days earlier – were not going to be realized, the stock price for Signalife plummeted 13% on unprecedented volume and was subsequently delisted from the AMEX. (¶¶ 17-18, 85-88). Investors realized during the April 14 conference call that there were no saleable products and that the purchase orders would not be fulfilled or recognized because, in the April 7, 2008, press release announcing the conference call, Signalife had previously stated:

> **Signalife, Inc. (Amex: SGN - News)** has confirmed that it has filed its form 10-KSB, and the company's Chairman and Chief Executive Officer, Dr. Lowell T. Harmison, has scheduled a webcast on April 14, 2008, at 10:00 a.m. EST.
>
> Dr. Harmison stated: "Now that Signalife has closed filing the company's form 10-KSB and *the Company is manufacturing and shipping product, I am pleased to provide direction on new contracts, pending orders and production, various product initiatives (from the Fidelity 100 to the prospective industry-wide application of the Fidelity 1000 module)*, and the Athletes For Life partnership, as well as such issues as the Company's immediate, positive financial prospects as well as several other initiatives that have now been completed. The webcast will be broadcast from a studio and will be attended by representatives of Athletes for Life Foundation and selected invited members of the business press. To the extent time permits, I will answer questions following my presentation. I urge all persons following the company to view the webcast."

Guglielmo Decl., Ex. 21

When Harmison said nothing during the conference call about the sales and revenues that the Fidelity 100 had purportedly generated, investors realized that no such sales and revenues existed, and the market reacted accordingly. As a result, the value of Plaintiffs' investment

declined and Signalife became a penny stock.  (¶¶ 15, 87).  These allegations are sufficient to plead loss causation.

**D.    Defendants' Allegedly Accurate Statements Were False or Misleading**

Defendants also argue that none of the statements set forth in the Complaint were false or misleading.  The Fourth Circuit recognizes that under the PSLRA, a court "must ascertain whether the complaint states ***sufficient facts*** to permit a ***reasonable*** person to find that the plaintiff satisfied this element of his claim - that the defendant made a false or misleading statement."  *Teachers' Ret. Sys.*, 477 F.3d at 173 (emphasis in original).  Here, the Complaint states that all of the statements regarding the Fidelity 100 purchase orders were false because Harmison told CW#2 that the purported orders did not exist.  (¶¶ 2, 18, 43, 88).  Taking these allegations as true, Plaintiffs have pled sufficient facts that would permit a reasonable person to claim that the Defendants issued false statements concerning the manufacturing, development and purchase orders of the Fidelity 100 throughout the Class Period.

The Complaint also sufficiently alleges that Defendants made several misleading statements about the development and purchase orders of the Fidelity 100.  (¶¶ 45, 47-52, 55, 58-59, 61-63, 66-68, 71-73, 75, 77,79, 81).  As Plaintiffs demonstrate, these statements were misleading because Defendants confused their own revenue recognition methodology and concealed the problems impacting the Fidelity 100's manufacturing and delivery, which precluded investors from seeing Signalife "through the eyes of management."  *In The Matter Of Caterpillar, Inc., Respondent*, No. 3- 7692, 50 S.E.C. 903 (Mar. 31, 1992).

Additionally, on October 10, 2007, Defendants touted "sales orders in excess of one half million dollars" in a press release.  (¶¶ 10, 73).  The Defendants then went on to say that "[t]hese purchases ***are currently resulting in revenues to the company*** such that the company anticipates

achieving break-even status by the end of January, 2008, or at the very latest *the end of 2008 first quarter*," which is the end of the Class Period. *Id.* The press release did not contain any language about the Company's policy of recognizing revenue upon delivery of product, nor any information on the customer. *Id. See also* ¶ 68 (press release touting purported orders in Mexico does not inform investors of Signalife's revenue recognition policy). According to this press release, revenue was coming into the Company as of October 2007, therefore the product must have been sold and delivered if the Defendants were following their own revenue recognition policy. One can imagine investors' surprise, when at the end of the 2008 first quarter, the Company had yet to recognize any of the revenue stemming from either the purported $500 million in sales orders or the orders received from Mexican physicians. (¶ 11) (Def. Ex. 29 at 2).

Moreover, Defendants failed to correct several statements they made about when the Fidelity 100 would be ready for sale, when there would be orders and when it would be ready to ship. (¶¶ 45, 47-52, 58, 61, 72, 76, 79). For instance, Harmison stated on February 28, 2008 that the Company had begun "delivery schedules for existing orders." (¶ 79). Also, the March 25, 2008 statement went so far to say that the Company "continues to ship orders under what Dr. Harmison calls an 'efficient production line at its manufacturing facility.'" (¶ 81). In that release, Harmison also stated: "*I am very comfortable with our production line capabilities*." *Id.* Importantly, Harmison made this statement after the purported manufacturing problems in 2007, and thereby reassured investors that there were no production problems. *See* Def. Brf. at 29.

Defendants believe that they did not mislead investors because the Company disclosed the manufacturing issues and the resulting shipping delays. *Id.* According to the Company's April 3, 2008 Form 10-KSB filing, these delays affected the September 14, 2007, September 24,

20

2007 and October 4, 2007 purchase orders, whose proceeds totaled over $5.7 million. *See* (Def. Ex. 29 at 18). In this filing, Company assured investors that it had commenced shipping units under the above orders in the first quarter of fiscal 2008. *Id.* However, as Harmison confirmed in the April 14, 2008 webcast and subsequent statements to CW#2, both of which occurred after the end of the first quarter 2008, no revenues had yet been recognized, despite the assertion that shipments had commenced in the first quarter of 2008. Defendants made no corrective statements before the end of the Class Period to inform investors of any additional manufacturing problems or shipping delays.[6] In fact, they only made reassuring statements that shipments continued as planned and there were no more problems with production.[7] These statements were false and misleading and they achieved Defendants' desired goal of misleading investors and inflating the Company's stock price in order to avoid being delisted from AMEX and advance Stein's stock manipulation scheme. For these reasons, Defendants cannot escape liability for making incomplete and misleading projections.

### E.    Defendants' Misrepresentations Were Material

Defendants go on to claim that the misleading statements they made about the Fidelity 100 were not material to investors. According to Defendants, the market did not care about when the Fidelity 100 would become commercially viable, when it would start generating meaningful sales, and when the Company would start earning revenues from the sale of the Fidelity 100. This argument can be rejected on its face. Indeed, in the context of a securities fraud claim, a fact is material "if there is a substantial likelihood that a reasonable [investor] (1)

---

[6]    Defendants argue that some of the shipments were refused by the customers. (Def. Brf. at 29). This information, however, was disclosed in the Company's August 15, 2008 filing, which was well after the Class Period, and provides no reason as to why Defendants misled investors into believing that revenue would be recognized by the first quarter of 2008 or since. *See* Def. Ex. 34.

[7]    As of September 30, 2008, the Company has not recognized any revenue from any purported purchase orders. *See* (Def. Ex. 34 at 3).

21

would consider the fact important in deciding whether to buy or sell the security or (2) would have viewed the total mix of information made available to be significantly altered by disclosure of the fact." *In re Microstrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 657 (E.D. Va. 2000). Here, the statements that Defendants made about their flagship product, the Fidelity 100, clearly were material to investors. The fate of the entire Company depended upon Signalife's ability to turn the Fidelity 100 into a commercially viable product that the Company then would be able to successfully sell to physicians and hospitals. The false statements about the Fidelity 100 and the sales and revenues that Signalife had generated went to the very core of the Company's business model. Clearly, a reasonable investor would consider this information important when deciding whether to buy or sell Signalife securities.

Moreover, the fact that Signalife's stock price dropped over 13% when the truth about the Fidelity 100 came to light further shows that investors thought the information was material. Courts recognize that, in an efficient market, "the concept of materiality translates into information that alters the price of the firm's stock." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997); *Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) (same). "As a result, when a stock is traded in an efficient market, the materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following the disclosure, of the price of the firm's stock." *In re Campbell Soup Sec. Litig.*, 145 F. Supp. 2d 574, 584 (D.N.J. 2001). As alleged in the Complaint, following the April 14, 2008 revelation that the Company had not recognized revenue in the first quarter of 2008 from purchase orders it had announced, as Defendants said it would, the stock dropped 13% and subsequently was delisted from the AMEX, becoming a penny stock. This dramatic stock price reaction clearly demonstrates that the market viewed Defendants' statements as material.

## II.    The PSLRA's Safe Harbor Provision Provides No Protection

Defendants go on to invoke the PSLRA's "safe harbor" for forward-looking statements. They claim that the false statements that Signalife and its top executives made about the Fidelity 100 are not actionable because they are merely optimistic, forward-looking statements that are accompanied by "meaningful cautionary language." (Def. Brf. at 34-35); (Harmison Brf. at 8-12). This argument fails for three reasons. First, Defendants' claim that they provided the market with "meaningful cautionary language" about the Fidelity 100 is a fact-based question that is inappropriate to raise or resolve on a motion to dismiss. Second, Defendants' boilerplate language in their public filings does not qualify as meaningful cautionary language within the meaning of the PSLRA's safe harbor for forward-looking statements. Third, Defendants' statements about the Fidelity 100 – and the sales and revenues that the Company had generated – are not protected by the safe harbor because they were knowingly false when made.

### A.    Defendants' Safe Harbor Argument Involves a Question of Fact that Is Not Appropriate to Raise on a Motion to Dismiss

Defendants' safe harbor argument fails – first and foremost – because it is based on a question of fact that is not appropriate to raise on a motion to dismiss. *See Asher v. Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. 2004) (meaningfulness of cautionary statements was fact question that is not appropriate to resolve on a motion to dismiss); *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 403 F.3d 1050, 1056-58 (9th Cir. 2005) (same); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1214 (1st Cir. 1996) (because "reasonable minds could ... disagree as to whether the mix of information in the [allegedly actionable] document is misleading," the statutory safe harbor provision cannot provide the basis for dismissal as matter of law); *Blatt v. Corn Prods. Int'l, Inc.*, 2006 WL 1697013, at *5 (N.D. Ill. June 14, 2006) (same).

The Seventh Circuit's opinion in *Asher* is right on point. There, the court explained:

> The fundamental problem is that the statutory requirement of "meaningful cautionary statements" is not itself meaningful. What must the firm say? Unless it is possible to give a concrete and reliable answer, the harbor is not "safe"; yet a word such as "meaningful" resists a concrete rendition and thus makes administration of the safe harbor difficult if not impossible.

*Id.* The difficulty in assessing the meaning of the term "meaningful" led the *Asher* Court to find that it could not be determined at the pleading stage, and to conclude that "[t]here is no reason to think – at least, no reason that a court can accept at the pleading stage, before plaintiffs have access to discovery – that the items mentioned in [Defendants'] cautionary language were those" that were realized when the truth emerged. *Id.* at 734. The court went on to emphasize that the adequacy of cautionary language is normally a jury question, which may not be resolved on a motion to dismiss unless "reasonable minds could not disagree that the challenged statements were not misleading." *Id.* Accordingly, at this preliminary pleading stage, the Court should reject Defendants' safe harbor argument on its face.

## B.    Defendants' Boilerplate Disclaimers Are Not Meaningful Cautionary Language

Defendants' safe harbor argument also fails because Defendants did not provide the market with "meaningful cautionary language" in this case. To be meaningful, cautionary language must "convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statement." *In re Lab Corp. of Am. Holdings Sec. Litig.*, 2006 WL 1367428, at *5 (M.D.N.C. May 18, 2006). In this regard, "not every risk disclosure will be sufficient to immunize statements relating to the disclosure; rather, 'the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions...which the plaintiffs challenge.'" *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1120-21 (10th Cir. 1997) (referring to the "bespeaks caution" doctrine which, like the safe harbor provision, protects forward-looking statements that are accompanied

24

by meaningful cautionary statements from liability); *see also City of Hialeah Employees' Ret. Sys. & Laborers Pension Trust Funds v. Toll Brothers, Inc.*, 2008 WL 4058690, at *3 (E.D. Pa. Aug. 29, 2008) (to be meaningful, the cautionary statements must identify important factors that could cause actual results to differ materially from those in the forward-looking statement).

　　　　Here, Defendants' so-called "cautionary language" consist of nothing more than boilerplate language contained in the Company's SEC filings and boilerplate cautionary language found in press releases. (Def. Ex. 45); (Harmison Brf. at 10). For instance, the Company's press releases provide the following boilerplate language: "Forward-looking statements involve known and unknown risks, which may cause Signalife's actual results in the future to differ materially from expected results. Factors which could cause or contribute to such differences include, but are not limited to...." *See e.g.* (Def. Ex. 27). This boilerplate language falls far short of the specific, factual statements required to invalidate Defendants' false and misleading statements. Importantly, Defendants made numerous statements about the Fidelity 100 without any qualification whatsoever. For instance, Defendants stated that the Company is "Actively Shipping Orders" (¶ 81); stated that "we commenced shipping...in the first quarter of 2008" (Def. Ex. 29 at 18), and stated that "the company anticipates achieving break-even status by the end of January, 2008, or *at the very latest the end of 2008 first quarter*." (¶ 73). The "cautionary" language contained in the Company's SEC filings and press releases did nothing to correct the false impression created by the Defendants' public statements or to supply the truth – *i.e.*, that the Defendants knew that revenue would not be recognized in the first quarter of 2008.

## C.　Defendants' Statements Are Not Protected by the Safe Harbor Because They Were Knowingly False When Made

　　　　Defendants' safe harbor argument also fails because the statements Defendants made about the commercial viability of the Fidelity 100 and its sales and revenues were false when

made. The PSLRA explicitly provides that the safe harbor does not apply where a party makes a statement "with actual knowledge" of its falsity. 15 U.S.C. §78u-5(c)(1)(A)-(B) (noting that the "safe harbor" would apply only if "the plaintiff fails to [plead] that the forward-looking statement ... was made with actual knowledge ... that the statement was false or misleading"); *In re Humphrey Hospitality Trust, Inc. Sec. Litig.*, 219 F. Supp. 2d 675, 684 (D. Md. 2002) (alleging particularized facts that show defendants had actual knowledge that the forward-looking statements were false when made would "blow the statements out of the safe harbor").

Here, Plaintiffs detail several misstatements made by Defendants during the Class Period and explains how Defendants knew the misstatements were false and misleading. *See Lormand v. U.S. Unwired, Inc.*. No., 2009 WL 941505, at *13-*14 (5th Cir. April 9, 2009) (Accepting the factual allegations as true, "plaintiff adequately alleges that the defendants actually knew that their statements were misleading at the time they were made, the safe harbor provision is inapplicable to all alleged misrepresentations."). Indeed, none of the "risks and uncertainties" and other cautionary language provided by Defendants have any application in the fact of definitive, knowingly false statements, such as Defendants' claim that "*these purchase orders are currently resulting in revenues to the company*" (¶¶ 10-11, 73), or Defendants' claim that "I am very comfortable with our production line capabilities" (¶ 81), or the claim that "our sales funnel...is proceeding ahead of schedule" (¶ 72), or the claim that "the company anticipates achieving break-even status by the end of January, 2008, or *at the very latest the end of 2008 first quarter* (¶ 73). These are examples of misstatements of hard current facts, not merely "puffing," "vague," or "optimistic" statements as Defendants try to assert.

26

**III.    The Complaint Adequately Pleads Violations of Section 20(A)**

Plaintiffs' §20(a) claim, which must be pled only in accordance with Rule 8, is properly pled. *See In re Royal Ahold N.V. Sec. & ERISA Litig*, 351 F. Supp. 2d 334, 408 (D. Md. 2004); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 415 (S.D.N.Y. 2003). Defendants first base their defense on the predictable contention that Plaintiffs have failed to allege a primary violation of the securities laws. (Def. Brf. at 37); (Harmison Brf. at 22); (Bunes at 8). Because Plaintiffs have alleged primary violations under §10(b) of the Exchange Act, as detailed herein, the Court should also sustain Plaintiffs' control person liability claims.

Second, Defendants allege that no Defendant other than Stein controlled the Company. "This Court must determine whether plaintiffs adequately allege facts that the person 'charged as a 'controlling person': (1) had the power to control the actions of the primary violator, and (2) was a culpable participant in the alleged illegal activity.'" *Datastream Sys.*, 2000 WL 33176025, at *3; *see also MicroStrategy*, 115 F.Supp.2d at 620 (Plaintiff satisfies Section 20(a) by "pleading facts showing that the controlling defendant 'had the power to control the general affairs of the entity primarily liable at the time... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.'"). The Complaint clearly establishes that the Individual Defendants were in top executive positions that afforded them the opportunity to control the actions of Signalife. (¶¶ 35-40). The fact that Stein controls the Company does mean that the Individual Defendants did not have the power to make false and misleading statements as alleged herein. (¶¶ 12, 18, 48, 68, 72, 79, 81). These facts, if proven, sufficiently allege that Individual Defendants are "control persons" for purposes of §20(a) of the Securities Exchange Act. The allegations present facts

27

that demonstrate more than negligent activity by the Defendants. Therefore, Defendants' motion to dismiss the § 20(a) claims must be denied.

**CONCLUSION**

As discussed herein, Plaintiffs have pled proper claims under Sections 10(b) and 20(a) of the Exchange Act consistent with Rule 8, Rule 9(b), the PSLRA and the law of this Circuit. Accordingly, Defendants' motions to dismiss should be denied in their entirety.

Dated: May 1, 2009                             Respectfully submitted,


                                               /s/ Terry E. Richardson, Jr.
                                               Terry E. Richardson, Jr. (#3457)
                                               RICHARDSON PATRICK
                                               WESTBROOK & BRICKMAN LLC
                                               1730 Jackson Street
                                               Barnwell, SC 29812
                                               Tel: (803) 341-7850
                                               Fax: (803) 541-9625
                                               trichardson@rpwb.com

                                               Liaison Counsel for Plaintiffs

                                               Beth Kaswan
                                               Joseph P. Guglielmo
                                               SCOTT + SCOTT, LLP
                                               29 West 57th Street, 14th Floor
                                               New York, NY 10019
                                               Tele: (212) 223-6444
                                               Fax: (212) 223-6334
                                               bkaswan@scott-scott.com
                                               jguglielmo@scott-scott.com

                                               David R. Scott
                                               SCOTT + SCOTT, LLP
                                               108 Norwich Avenue
                                               P.O. Box 192
                                               Colchester, CT 06415
                                               Tel: (860) 537-5537
                                               Fax: (860) 537-4432
                                               drscott@scott-scott.com

28

Arthur L. Shingler III
Luis E. Lorenzana
SCOTT + SCOTT LLP
600 B Street, Suite 1500
San Diego, California 92101
Tel.: (619) 233-4565
Fax: (619) 233-0508
ashingler@scott-scott.com
llorenzana@scott-scott.com

Lead Counsel for Plaintiffs