IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Robert A. Latham, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | C/A No. 6:08-cv-2995-RBH |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER |
| Bill Matthews, Pamela M. Bunes, Robert C. Scherne, Kevin F. Pickard, Lowell T. Harmison, Marvin H. Fink, and Signalife, Inc., | ) ) ) ) | |
| Defendants. | ) ) | |
| Darryl K. Roth, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | C/A No. 6:08-cv-3183-RBH |
| Plaintiff, | ) ) | |
| vs. | ) ) | ORDER |
| William R. Matthews, Pamela M. Bunes, Robert C. Scherne, Kevin F., Pickard, Lowell T. Harmison, Marvin H. Fink, and Signalife, Inc., | ) ) ) ) | |
| Defendants. | ) ) | |

The above-captioned matter comes before the Court on Defendants' joint and separate motions

to dismiss the Plaintiffs' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.[1]

---

[1]     Defendants Signalife, Inc., Kevin F. Packard, Robert C. Scherne, and William R.
Matthews (the "Signalife Defendants") filed a Motion to Dismiss on February 11,
2009. (CA. No. 6:08-cv-2995 ("Latham Case"), Doc. # 52; CA. No. 6:08-cv-3183
("Roth Case"), Docs. # 45 & 52.)  Defendant Pamela M. Bunes filed separately on
the same date, joining in the Signalife Defendants' motion, and setting forth

1

Plaintiffs are putative class members in consolidated actions involving alleged violations of federal securities laws and regulations. Defendants are a medical device corporation and certain employees, officers and board members of that corporation.[2] For their consolidated class action complaint ("Complaint"), the Plaintiffs have alleged violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.[3] 15 U.S.C. § 78a, *et seq.*; 17 C.F.R. § 240.10b-5. Briefly stated, the Plaintiffs claim that the Defendants made numerous public statements during the four-year class period regarding the sales, marketability and production status of certain company products, when in fact, they knew that sales orders did not exist and company products were not ready for the market. The Defendants argue that the Plaintiffs' Complaint fails to meet the pleading requirements of Private Securities Litigation Reform Act (the "Reform Act" or "PSLRA"); and that certain of the Plaintiffs' claims are time barred under the statute of limitations. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331. Having carefully considered the pleadings, briefs, supporting affidavits, and oral arguments by

---

separate grounds for dismissal. (Latham Case, Doc. # 53; Roth Case, Docs. # 44 & 53.) Defendant Lowell T. Harmison also filed separately, and also joined in the Signalife Defendants' motion. (Latham Case, Doc. #44.) Defendant Mitchell J. Stein has not moved for dismissal and has yet to answer the Plaintiffs' Complaint; apparently protected by an automatic stay due to a pending bankruptcy action. 11 U.S.C. § 362; (Latham Case, Doc. # 70; Roth Case, Doc. # 68, Suggestion of Bankruptcy as to Mitchell J. Stein.) Defendant Budimir S. Drakulic has not moved for dismissal, nor otherwise filed any responsive pleadings. This Order then addresses motions to dismiss by six of the eight defendants in this consolidated action.

[2] With the exception of Defendant Mitchell J. Stein, all the individually named defendants are alleged to fall into one or more of these categories. Defendant Stein, while not an officer or director, is alleged to have controlled the company by and through its officers, directors and employees during the class period. (Latham Case, Doc. # 36.)

[3] §10b of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78j; SEC Rule 10b-5, codified at 17 C.F.R. § 240.10b-5; § 20(a) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78t.

the parties, the Court grants in part and denies in part the Defendants' motions.

## PROCEDURAL HISTORY AND SUMMARY OF CLAIMS

On August 28, and September 17, 2008, Plaintiffs Robert A. Latham and Darryl K. Roth filed their respective complaints, individually and on behalf of those similarity situated, against Signalife, Inc.[4] and various of its officers and board members. (Latham Case, Doc. # 1; Roth Case, Doc. # 1.) On October 28, 2008, class members Byran D. Harris, Mark Taylor and Greg Taylor ("Taylor Signalife Investor Group" or "Plaintiffs") moved to consolidate the actions and for court appointment as lead plaintiffs. (Latham Case, Doc. # 17; Roth Case, Doc. # 10) On November 20, 2008, without opposition, the Court approved the Taylor Signalife Investor Group as lead plaintiff and granted leave to file an amended complaint on the consolidated actions. On December 10, 2008, the Plaintiffs filed their Amended Complaint. (Latham Case, Doc.# 36, "Complaint".) Therein, the Plaintiffs name as defendants: Signalife, Inc., Mitchell J. Stein, Lowell T. Harmison, Pamela M. Bunes, Kevin F. Pickard, Robert C. Scherne, Budimir S. Drakulic and William R. Matthews (collectively "Defendants") Against these Defendants, the Plaintiffs allege two causes of action: violation of Section 10(b) of the Exchange Act and Rule 10b-5 against all defendants, and violation of Section 20(a) of the Exchange Act against the individually named defendants.

The specific allegations in the Complaint are set forth more fully below, but generally allege a stock manipulation scheme, coordinated by Defendant Stein and perpetrated by the other individual defendants in their roles as company officers, board members and employees of Signalife. Plaintiffs

---

[4] In 2005, during the class period, Recom Managed Systems, Inc. changed its name to Signalife, Inc. In 2008, Signalife again changed its name to HeartTronics, Inc. (Compl. ¶ 3.) For simplicity, the Court refers to the company as Signalife throughout this Order.

allege that during the four-year class period the Defendants made false statements and failed to disclose material facts regarding the sales, marketability, and production status of its "revolutionary" heart-monitoring products. These products, primarily the Fidelity 100, were touted to have been market-ready and producing sales for Signalife, when in fact –the Plaintiffs allege– the products were never fully-functional, no sales revenue was produced, and the Defendants had no intentions of producing and selling these products. Plaintiffs further allege that as contrary information became available to the market regarding the development of its products, driving the stock price down, the Defendants would respond with additional false and misleading statements, until eventually it became clear in the absence of expected reassurances by Signalife, that the company had been misleading investors about its products, and the stock price plummeted. All the while, Plaintiffs allege, Defendant Stein had been benefitting both from short sales of the stock prior to the disclosure of bad news, and stock sales as the latest round of good news from Signalife temporarily increased the stock's value.

## STANDARD OF REVIEW

When reviewing a motion made under Federal Rule of Civil Procedure 12(b)(6), the Court must "accept all well-pleaded allegations in the plaintiff's complaint as true and draw all reasonable factual inferences from those facts in the plaintiff's favor." *Edwards v. City of Goldsboro*, 178 F.3d 231, 244 (4th Cir. 1999). The plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 127 S.Ct. 1955, 1965 (2007). "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 127 S.Ct. at 1969. A complaint attacked by a motion to dismiss will survive if it contains "enough facts to state a claim to relief that is plausible on its face." *Id*. at 1974; *see also*, *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir.

4

2008); *Self v. Norfolk Southern Corp.*, No. 07-1242, 2008 WL 410284, at *1 (4th Cir. February 13, 2008) (unpublished).

## FACTUAL ALLEGATIONS

In 2002, Signalife's predecessor is formed for the purpose of developing a heart-monitoring system.  (Compl. ¶ 3.)  On September 19, 2002, Steven O. Sparks became a member of Signalife's board of directors, and assumed duties as CEO.  (Signalife Defs.' Mo. Dismiss, p. 3.)  Sparks left the company a month later, in October 2002, and was replaced by Marvin H. Fink.  (Compl.  p. 6, n. 6.)

On February 20, 2004, Signalife made the first of thirty-six public statements the Plaintiffs allege were materially false or misleading.  (Compl. ¶¶ 44-83.)  The Plaintiffs allege that after this first statement was made, touting the production status of its "revolutionary" flagship product, the company's stock "climbed from $3.65 to $8.20."  (Compl. ¶ 46.)

Around this same time, Signalife was engaged in a lawsuit with its former CEO, Steven Sparks. On June 23, 2004, in response to a lawsuit filed by Signalife seeking declaratory relief on its contractual obligations, Sparks filed certain cross-claims against the company.  (Signalife Defs.' Mo. Dismiss, Ex. 3, SEC Form SB-2/A.)  On July 26, 2004, the company informed investors in SEC filings of the existence of the lawsuit and Sparks' cross-claims.  *Id.*  On September 15, 2004, Sparks amended his cross-claims and alleged numerous instances of improper conduct on the part of Signalife and Mitchell Stein.[5]  Included in these allegations were claims that Stein, who was neither an officer, director or shareholder of the company, personally controlled Signalife and was running it without supervision from its board or officers as a stock manipulation scheme.  (Compl. ¶ 34.)  Sparks further questioned

---

[5]     The Court has not been provided a copy of Sparks' original cross-claims, therefore, it cites to the amended cross-claims in this Order.

the commercial viability of the company's flagship product, the Fidelity 100. (Signalife Defs.' Mo.

Dismiss, Ex. 4.)

From December 2004 through March 2006, the Plaintiffs' contend that Signalife made

numerous other materially false or misleading statements that caused the stock price to rise again.

(Compl. ¶¶ 48-59.) Included in these statements were information regarding a multi-year marketing and

sales agreement with Rubbermaid Medical Solutions ("Rubbermaid"), whereby Rubbermaid would be

responsible for all marketing and sales efforts for a "nationwide rollout" of company products. *Id.* at

¶ 55.) Under the terms of the parties' marketing agreement, Rubbermaid paid Signalife $2,000,000.00

in return for a 35% commission on sales of the products. (Signalife Defs.' Mo. Dismiss, Ex. 24.)

On March 30, 2006, Marvin Fink, Signalife's next consecutive CEO, also engaged in litigation

against the company. (Signalife Defs.' Mo. Dismiss, Ex. 13, p. 20.) The company again informed

investors of this lawsuit in SEC filings. *Id.* On July 11, 2006, Fink filed an amended complaint,[6]

where he alleged that Stein exerted improper influence over the company and its board and officers and

was defrauding investors. *Id.* at Ex. 14.

From July 2006 until January 2007, Plaintiffs alleged that Signalife issued another round of

public statements that were materially false and misleading. Included in these statements were

announcements that Rubbermaid had breached the terms of its marketing agreement, and Signalife was

suing Rubbermaid for failure to perform. (Compl. ¶ 64.) Signalife further notified investors that

Rubbermaid had also filed a separate suit against the company, but that Rubbermaid's allegations were

"merely a pretext raised by Rubbermaid to avoid performing its obligations under [the parties marketing

---

[6]     As was the case with the original Sparks' cross-claims, the Court has not been
provided a copy of the original Fink complaint.

and sales agreement.]" (Compl. ¶ 65.)  For its complaint, Rubbermaid alleged that the company had

breached its contract because its products were "incomplete and defective and did not perform to design

and performance specifications."  (Signalife Defs.' Mo. Dismiss, Ex. 24.)

Once again, the Plaintiffs allege that the company responded with another series of materially

false and misleading statements, including promises that the company had "cleaned house" (Compl.

¶ 72) and had made a number of multi-million dollar sales and purchase orders for its products in late

2007 and early 2008.  *Id.*  ¶ 66-83.

Finally on April 14, 2008, Plaintiffs allege that the Defendants held a webcast for the purported

purpose of "providing direction on new contracts, pending orders and production..." (Pl. Memo. Op.

Harmison & Bunes, Ex. 21.)  When Signalife failed to provide this information, Plaintiffs allege that

the "gig" was up. (Compl. ¶ 52.)  Investors realized that the company had no sales orders or products

to sell, and the stock price plummeted.  *Id.*

## ANALYSIS

The moving Defendants seek dismissal and assert that the Plaintiffs' Complaint fails to state

a claim upon which relief can be granted.  Plaintiffs bring claims against the Defendants under Section

10(b) of the Securities Exchange Act of 1934 (the "Exchange Act")(and Rule 10b-5 promulgated under

that act), as well as Section 20(a) of the Exchange Act.  Section 10(b) makes it unlawful to employ

deceptive or manipulative devices "in connection with the purchase or sale of any security."  15 U.S.C.

§ 78j.  Section 20(a) acts to impose secondary liability, joint and severally, on any person who

"controls" a person liable for a securities act violation.  15 U.S.C. 78t.  The Defendants assert that the

Plaintiffs' 10(b) claims fail to meet the pleading requirements; specifically with regard to the elements

of 1) fraud, 2) materiality, 3) scienter, and 4) loss causation.  Defendants also argue that the Plaintiffs'

7

Section 20(a) claims fail, both because the Plaintiffs' primary 10(b) claims fail, but also because the individual defendants cannot be said to have exercised "control" over the person who made the allegedly false or misleading statements. Finally, the Defendants argue that without regard to the Plaintiffs' ability to meet the pleading requirements, some of the Plaintiffs' causes of action are time barred by the applicable statutes of limitation.[7]

## 1.    STATUTE OF LIMITATIONS.

The Court first addresses the Defendants' assertion that certain of the Plaintiffs' claims are time barred. The parties agree that the Plaintiffs' § 10(b) claims are governed by the statute of limitations as set forth in 28 U.S.C. § 1658, which provides in relevant part:

> [A]a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of--
>
> (1) **2 years after the discovery of the facts constituting the violation**; or
>
> (2) 5 years after such violation.

28 U.S.C.A. § 1658 (emphasis added.)[8]  Defendants assert that "the facts constituting the violation"

---

[7]    The Defendants classify the numerous false and misleading statements alleged in the Plaintiff's Complaint in four categories: 1) failure to disclose Defendant Stein controlled Signalife, 2) false statements regarding the commercial viability of the Fidelity 100, 3) false statements regarding marketing, orders and sales or the Fidelity 100, and 4) false statements regarding the development of other, (not the Fidelity 100), heart monitoring products.  (Signalife Defs.' Mo. Dismiss., pp. 1-2.) The Defendants argue that the Plaintiffs' claims as to categories 1 & 2 are time barred.  Defendants do not contend or argue that categories 3 & 4 are time barred.

[8]    Section 10(b)'s statute of limitations has undergone significant transformation over the years.  After the SEC promulgated Rule 10b-5 in 1942, and courts began to recognize an implied private right of action under this rule (*E.g. Kardon v.*

regarding Defendant Stein's alleged control of Signalife, and that the Fidelity 100 was not a commercially viable product, were known to the Plaintiffs more than two years before they filed their initial complaints in August and September 2008. Specifically, they argue that two separate lawsuits naming Signalife as a party, initially filed on February 13, 2004 and March 30, 2006, put the Plaintiffs on notice of the alleged wrongdoing they now rely upon as the factual basis for these claims.

The starting point of the Court's limitation analysis begins with identifying its commencement. The commencement of the statute of limitations under a securities act violation is governed by federal case law. *Cooke v. Manufactured Homes, Inc.*, 998 F.2d 1256, 1263 (4th Cir. 1993) (holding that the date which "commences the limitations period for the § 10(b) and Rule 10b-5 claims ...must be resolved by federal law.") In the Fourth Circuit, the statute of limitations begins to run when the fraud is discovered or should have been discovered by the exercise of due diligence. *Brumbaugh v. Princeton Partners*, 985 F.2d 157, 162 (4th Cir.1993). Discovery of facts constituting the alleged misrepresentations or omissions may arise from actual notice, constructive notice, or inquiry notice. *In re USEC Securities Litig.*, 190 F.Supp. 2d 808, 816 (D.Md 2002) *aff'd. Cohen v. USEC, Inc.,* 70 Fed. Appx. 678 (4th Cir. 2003)(unpublished.) "Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam. Merely bringing suit after the scheme has been laid bare through the efforts of others ... will not satisfy the requirements of due diligence when there have been prior warnings that something was amiss." *Brumbaugh*, 985 F.2d at 162 (internal citations

---

*National Gypsum Co.*, 69 F.Supp. 512, 515 (D.C. Pa. 1946), state statutes of limitations were applied. In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 358, (1991) the Supreme Court created a federal statute of limitations of one year with a three year statute of repose for all § 10(b) claims. In 2003, Congress codified this holding, modifying the respective periods to two and five years. PL 107-204, 2002 HR 3763 28 USC 1658. effective July 30, 2003.

omitted). "The objective standard of due diligence requires reasonable investigation of the possibility of misrepresentation once an individual has been placed on inquiry notice of wrongdoing." *Brumbaugh*, 985 F.2d at 162.[9]

---

[9]    There appears to be a lack on consensus among circuits as to when the statute of limitations in a securities fraud action accrues. The Fourth, Fifth and Eleventh Circuits commence the limitations period when the plaintiff has inquiry notice and is obligated to investigate further. *See, e.g.*, *Caviness v. Derand Resources Corp.*, 983 F.2d 1295, 1303 (4th Cir. 1993); *Jensen v. Snellings*, 841 F.2d 600, 607 (5th Cir. 1988); and *Franze v. Equitable Assurance*, 296 F.3d 1250, 1255 (11th Cir. 2002).

In the First, Second, Third, Sixth, Seventh, Eighth and Tenth Circuits, an investor is obligated to begin investigating once on inquiry notice, but the statute of limitations does not begin to run until a person conducting such an investigation with reasonable diligence would have uncovered the fraud. *See, e.g., Young v. Lepone*, 305 F.3d 1, 9 (1st Cir. 2002); *Staehr v. Hartford Financial Services Group, Inc.*, 547 F.3d 406, 411 (2nd Cir. 2008); *In re Merck & Co., Inc. Securities, Derivative & ""ERISA"" Litig.*, 543 F.3d 150, 161 (3rd Cir. 2008); *New England Health Care Employees Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003); *Marks v. CDW Computer Centers, Inc.*, 122 F.3d 363, 368 (7th Cir. 1997); *Great Rivers Co-op. of Southeastern Iowa v. Farmland Industries, Inc.*, 120 F.3d 893, 898-99 (8th Cir. 1997) and *Sterlin v. Biomune Systems*, 154 F.3d 1191, 1201 (10th Cir. 1998).

In the Ninth Circuit, it appears that the statute of limitations does not begin to run until the plaintiff has adequate proof that a prior false representation was made with scienter. *See Betz v. Trainer Wortham & Co., Inc.*, 519 F.3d 863, 877, Fed. Sec. L. Rep. (CCH) P 94588 (9th Cir. 2008), *petition for cert. filed*, 76 U.S.L.W. 3646, 77 U.S.L.W. 3021 (U.S. May 27, 2008).

Recently, the Supreme Court granted certiorari to address this issue. *Merck & Co., Inc. v. Reynolds*, 129 S.Ct. 2432 (U.S. May 26, 2009). In Merck's petition, it argued that the Courts of Appeals employ three "sharply divergent tests to determine when the Statute of Limitations begins to run." 2009 WL 133458, *18. The Fourth and Eleventh, and sometimes the Fifth and Eighth Circuits, employ a "pure" storm warnings approach, while the First, Sixth, Seventh, and Tenth, and sometimes the Second Circuit, employ a storm warnings plus investigation standard. *Id.* *20-21. Finally, the petitioner argued that Third and Ninth Circuits employ a third approach, requiring evidence of a claim without any investigation. *Id.* at 23.

Defendants argue that two law suits, *Recom Managed Systems, Inc. v. Sparks*, No. SC-038642 (Ventura Co. Superior Court, Feb. 13, 2004) (the "Sparks Lawsuit") and *Fink v. Signalife, Inc., et al.*, Ca. No. BC349925 (Los Angeles Co. Superior Court, Mar. 30, 2006) (the "Fink Lawsuit") put potential plaintiffs on inquiry notice regarding Stein's control over Signalife and the questionable commercial viability of the Fidelity 100. The Plaintiffs do not dispute they had notice of the Sparks and Fink Lawsuits, as Signalife made investors aware of these suits in subsequent SEC filings. (Signalife Defs.' Mo. Dismiss, Exs. 3 & 13.) Therefore, the Court evaluates the application of the Statute of Limitations as a matter of law. *Brumbaugh*, 985 F.2d at 162 ("Where the underlying facts are undisputed, the issue of whether the plaintiff has been put on inquiry notice can be decided as a matter of law.")

Plaintiffs argue that neither the Sparks nor the Fink case placed Plaintiffs on inquiry notice or excited storm warnings triggering the commencement of the statute of limitations because neither lawsuit alleged that Stein or the remaining Defendants made false and misleading statements in violation of the Exchange Act, nor did either lawsuit allege that Stein and the Company failed to disclose that Stein was truly in control of the Company. Plaintiffs further argue that they were not placed on inquiry notice because Stein and the Company flatly denied the allegations that Stein controlled the Company. Plaintiffs also argue that they were not put on inquiry notice because neither lawsuit alleged securities fraud. Finally, Plaintiffs contend that with regard to the commercial viability of the Fidelity 100, any inquiry notice was negated by Defendants' numerous statements touting the commercial viability of the product.

Again, in the Plaintiffs' briefing on the issue, Plaintiffs do not argue or dispute that they were unaware of the existence of the lawsuits, but argue rather that any significance attached to these lawsuits

was negated by the fact that: 1) neither lawsuit alleged the Defendants made statements in violation of the Exchange Act; 2) neither lawsuit alleged that Stein and the Company failed to disclose that Stein was truly in control; 3) the Company flatly denied the allegations in the lawsuits; and 4) the Company made reassuring statements touting the commercial viability of the Fidelity 100.

While the Plaintiffs do not argue whether notice existed, they do dispute whether that notice created inquiry notice as a matter of law. Plaintiffs further argue that this Court should adopt the Second Circuit's "reassuring statements" test, and find that Signalife's subsequent public statements acted to dissipate any duty of inquiry. *See LC Capital Partners, LP, v. Frontier Ins. Group, Inc.*, 318 F.3d 148, 156-57 (2nd Cir. 2003.) The Court declines to adopt this test. As noted above, (*supra*, n. 9) the Fourth Circuit employs a different test when evaluating the existence of inquiry notice, and views the subsequent actions of the defendants through a prism of fraudulent concealment.[10] *GO Computer, Inc. v. Microsoft Corp.*, 508 F.3d 170, 178 (4th Cir. 2007) ("Inquiry notice, which charges a person to investigate when the information at hand would have prompted a reasonable person to do so, touches on the diligence requirement of [the third part of our fraudulent concealment test].") Since the Fourth Circuit has already articulated the procedure for addressing statements by defendants, this Court is

---

[10]     *See City of Ann Arbor Employees Retirement System v. ICG, Inc.*, 2008 WL 4509356, CA No. 2:07-0226, *10 (S.D.W.Va. Sept. 30, 2008.) ("It is logical that the equitable estoppel principles in the form of the reassuring statements given credence in the Second and Third Circuits have been read into federal securities laws in the Fourth Circuit "only where a defendant has mislead a plaintiff, causing that plaintiff to delay filing a viable suit until after that suit becomes barred by a statute of limitations...[and] is typically applied where a defendant has misrepresented to a plaintiff his legal rights... or has used settlement negotiations to induce delay...." (citing *Caviness v. Derand Resources Corp.*, 983 F.2d 1295, 1302 (4th Cir. 1993)).

bound to apply its own law, rather than borrow from its sister circuits.[11]

In *GO Computer*, the manufacturer of certain software sued Microsoft alleging antitrust violations. 508 F.3d at 172-73. In evaluating whether the plaintiffs were put on inquiry notice, the court affirmed the district court's finding that statements made by the plaintiffs regarding the "multiplicity and specificity of the information" demonstrated that the plaintiffs had knowledge of "a pattern of particular actions that a defendant has taken against him, [and] though the pattern's precise scope might be unclear and its exact legal ramifications uncertain, the plaintiff is on inquiry notice of his claim." *Id.* at 179.[12]

With this precedent in mind, the Court now turns to the allegations made in this case. As noted above, the Defendants point to the Sparks and Fink Lawsuits as putting potential plaintiffs on inquiry

---

[11]    Since the Plaintiffs have not argued for equitable tolling under the Fourth Circuit's fraudulent concealment doctrine, the Court declines to address it at length here. It is sufficient to say that in light of the Fourth Circuit's holdings in *GO Computers,* 508 F.3d at 178 ("[D]enial of wrongdoing amounts to little; wrongdoing is not a straightforward matter of fact, and it is not fraud to deny it.... To permit a claim of fraudulent concealment to rest on no more than an alleged failure to own up to illegal conduct upon this sort of timid inquiry would effectively nullify the statute of limitations in these cases.") and *Supermarket of Marlinton, Inc. v. Meadow Gold Daires, Inc.*, 71 F.3d 119, 126 (4th Cir. 1995) (holding that to prevail on an argument that fraudulent concealment tolls the statute of limitations, "the plaintiff must demonstrate [,among other things, that he] failed to discover those facts within the statutory period.") it does not appear to apply in this case. *See also Glaser v. Enzo Biochem, Inc.*, 126 Fed. Appx. 593, 598 n.3 (4th Cir. 2005) (denying equitable tolling and holding "[e]ven if [the defendants'] subsequent conduct in discovery delayed the plaintiffs' full understanding of the alleged fraud, it did not prevent the plaintiffs from filing a complaint within one year of inquiry notice.")

[12]    In weighing the harshness of this result, the Fourth Circuit noted, "And lest this seem too quick a trigger, it bears emphasis that the date of inquiry notice is not a filing deadline. It is only the date on which a cause of action accrues and the [statutory period] allotted by Congress for a plaintiff to investigate begins." *Id.*

13

notice of certain securities law claims.[13] Sparks and Fink were consecutive CEO's at Signalife. Sparks served from September 19 to October 12, 2002. (Signalife Defs.' Mo. Dismiss, Ex. 1.) Fink replaced Sparks and served until March 22, 2005. *Id.* at Ex. 8. The following relevant allegations were made in their respective suits.

The Sparks Lawsuit involved an amended cross-complaint against Signalife and Stein, filed by Sparks on September 15, 2004, in which Sparks alleged:

- At various times mentioned herein, Stein has acted as the outside general counsel for [Signalife]. Stein is married to Tracey Wilson Hampton Stein, who is the owner of approximately 70% of the issued and outstanding shares of [Signalife]. Through his wife's ownership of said shares, **Stein effectively controls and directs the operations of [Signalife]**. (Signalife Defs.'Mo. Dismiss, Ex. 4, Sparks Cross-Claim, ¶ 3) (emphasis added.)

- Sparks is informed and believes, and thereon alleges, that at all times mentioned herein cross-defendant **[Signalife] was and is a mere shell, conduit and instrumentality through which cross-defendant Stein carries on his business, exercising complete control and dominance of such corporation** to such an extent that any individuality or separateness of the corporation and Stein does not, and did not, exist. ... Stein was and is through control of his wife's shares, the controlling shareholder of [Signalife], and that **Stein exercises direction and control of the officers and directors of [Signalife] such that the corporation acts only at the direction and under the control of Stein and there exists a unity of interest between the corporation and Stein.** *Id.* at ¶ 4 (emphasis added.)

- Stein regularly orders the board of directors to approve [Signalife's] public filings, such as 10-K and 8-K filings with the Securities and Exchange Commission, **without giving the board of directors sufficient opportunity to obtain information or advice of corporate counsel with respect to such filings or to review and approve of said filings.** *Id.* (emphasis added.)

---

[13]     All parties have attached certain documents to their briefs and asked the Court to consider these documents in determining whether to dismiss the Plaintiffs' Complaint. Except as otherwise noted in this Order, the Court takes judicial notice of the documents referenced in this Order as they are "integral to and explicitly relied on in the [Plaintiffs']complaint and because no party has challenged their authenticity." *Phillips v. LCI International, Inc.,* 190 F.3d 609, 618 (4th Cir. 1999). These documents include various pleadings in lawsuits referenced in the Complaint as well as various SEC filings referenced in the Complaint.

- Stein directs and orders [Signalife's] officers and board of directors members to buy and/or sell [Signalife] stock, **as part of Stein's overall manipulation of [Signalife's] stock price**. *Id.* (emphasis added.)

- **Stein has directed and ordered directors not to conduct due diligence and not to speak to each other or to [Signalife's] corporate counsel regarding various [Signalife] business matters**. *Id.* (emphasis added.)

- **Stein has ordered directors to withhold public information, such as [Signalife's] 8-K filings, from potential investors.** *Id.* (emphasis added.)

- Stein has issued or caused to be issued [Signalife] stock to third persons **without adequate consideration and without informing the board of directors**. *Id.* (emphasis added.)

- [S]uch control and domination of [Signalife] is a continuing pattern of Stein and that he has similarly controlled and dominated other publically traded corporations in the past, including but not limited to the company formerly known as E-Medsoft. *Id.*

- Stein has transferred assets between himself and the Corporation without regard to the separateness of the corporation, and that Stein paid [Signalife's] expenses from Stein's own funds or with [Signalife] stock controlled by Stein without regard to the separateness of the corporation, and that **Stein has received assets from [Signalife] without giving fair consideration.** *Id.* (emphasis added.)

- [Signalife] further alleges that it has received approval from the Food and Drug Administration ("FDA") 'to proceed to market with its first technological device.' **Sparks is informed and believes, and on that basis alleges, that if any technological device has been given approval by the FDA, it is not the heart monitoring device.** *Id.* at ¶ 30. (emphasis added.)

- **[Signalife]'s heart monitoring device remains in development and in all probability will not be ready for market for several years.** *Id.* at ¶ 31. (emphasis added.)

- The technology may in fact have **no practical market usage**, may not have any competitive advantage in the marketplace, and may not be profitable even if the technology can be brought to the market. *Id.* (emphasis added.)

- **The heart monitoring technology may have no practical usage in the medical field**, in that the remote monitor contemplated by [Signalife] would send a continuous stream of data to a remote receiver, which data steam would require constant analysis for the data to be of use. *Id.* (emphasis added.)

- **There does not presently exist any computer program capable of analyzing such a stream of data** and that medical practitioners would not be able to make use of such a data stream

without such a computer program to analyze it in that analyzing the date stream by medical personal directly would require an untenable number of personnel hours and expertise, and consequently even if [Signalife's] heart monitor technology can be brought to market, there may be no demand for such a product. *Id.* (emphasis added.)

• Stein similarly caused [Signalife] stock to be issued to other third parties **without advising Sparks or the [Signalife] board of directors and without the company obtaining fair consideration for such shares.** *Id.* at ¶ 41 (emphasis added.)

• Stein was selling, hypothecating, hedging, or otherwise trading shares of [Signalife] stock controlled by him or his wife. *Id.* at ¶ 42.

• Stein has sold hundreds of thousands of shares of [Signalife] stock which were owned by Stein's wife and controlled by Stein, even though Stein has told other [Signalife] shareholders and the members of [Signalife's] board of directors that Stein is not selling shares, and that **Stein sold such shares to manipulate [Signalife's] stock price.** *Id.* at ¶ 43 (emphasis added.)

• Sparks is informed and believes and thereon alleges that **Stein has manipulated or attempted to manipulate [Signalife's] stock price by [various improper methods.]** *Id.* at ¶ 44 (emphasis added.)

• Sparks is informed and believes and thereon alleges that such conduct by Stein is part of a continuing practice by Stein and that he has similarly manipulated the stock price of other publically traded corporations, including but not limited to the company formerly known as E-Medsoft. *Id.* at ¶ 45.

• The Conduct of [Signalife] and **Stein alleged herein was done in order to be able to manipulate the number of shares available for trading**, to restrict the supply of tradeable shares, and thereby to cause [Signalife's] stock price to rise or enable it to resist downward market pressures. Sparks is informed and believes and thereon alleges that Stein and [Signalife] also manipulated the [Signalife] stock price in other ways that **Stein concealed from Sparks and other [Signalife] board members**. Such conduct constituted a violation of California Corporations Code Section 25400, and consequently [Signalife] and Stein are liable to Sparks for damages resulting from such conduct. *Id.* at ¶ 46 (emphasis added.)

The Sparks Lawsuit then paints a picture of a shell corporation, without products to sell, being

controlled by the spouse of its largest shareholder, used to defraud inventors, without the supervision

of its corporate officers with regard to the information being disseminated to the investing public.

The second lawsuit, filed by Signalife's next consecutive CEO, makes somewhat less damning

16

factual allegations, but also alleges that Defendant Stein effectively controlled the company and manipulated corporate officers for his own personal gain. Specifically, in Fink's amended complaint, filed July 11, 2006, Fink alleges that he was fired by Signalife after refusing to acquiesce to certain management level decisions championed by Defendant Stein. (*Id.* at Ex. 14, ¶ 33.) Thereafter, Fink alleges that he was blocked from selling certain restricted shares of company stock, his sole compensation for his two-year tenure as CEO, so that Defendant Stein's spouse could unload her own stock onto the market at top dollar. *Id.* at ¶ 44. Fink further alleges that the Steins "use[d] their power to control the corporation to seek to gain an advantage in the sale or transfer or use of their controlling block of shares." *Id.* at ¶ 59.

Based upon the allegations found in these two lawsuits, the Court finds as a matter of law that the specificity and source of these statements is sufficient to place the Plaintiffs on inquiry notice of its securities law claims alleging Stein's control of Signalife, and that Fidelity 100 was not a commercially viable product. These are not mere anonymous internet postings questioning decisions made by company management, but specific allegations made by two consecutive company officers alleging Stein controlled Signalife for his own financial gain and to the detriment of its shareholders, and asserting that the Fidelity 100 had questionable commercial viability.[14]

Plaintiffs argue that these lawsuits are insufficient to establish inquiry notice because they did not specifically allege securities law violations. (Plt. Mo. Opp. Harmison & Bunes, p. 3.) The Court

---

[14] The Defendants also cite to certain internet postings as evidence that the Plaintiffs were placed on inquiry notice. Because the Court finds that the Sparks and Fink Lawsuits were sufficient to place the Plaintiffs on inquiry notice, it does not wade into the legal morass that seeks to determine whether anonymous internet postings would place potential plaintiffs on inquiry notice.

finds this argument unpersuasive. Even though these prior lawsuits did not allege federal securities fraud causes of action or claims, they did contain specific factual allegations which would place a reasonable investor on notice that a federal securities claim may exist.[15] "Commencement of a limitations period need not... await the dawn of complete awareness." *Brumbaugh*, 985 F.2d at 162. "Inquiry notice is triggered by evidence of the possibility of fraud, not by complete exposure of the alleged scam." *Id.* The court finds that the Plaintiffs' claims regarding Stein's alleged control of Signalife and the commercial viability of the Fidelity 100 are barred by the statute of limitations as a result of the Sparks and Fink lawsuits, which Plaintiffs do not dispute their awareness of more than 2 years prior to the filing of this action.

2.     **PLAINTIFFS' 10(B) AND RULE 10B-5 CLAIMS.**

The Court next turns to the first of the Plaintiffs' claims against the Defendants: its § 10(b) allegations. Plaintiffs have asserted claims against all Defendants for violation of § 10(b) and Rule 10b-5. "To establish liability under § 10(b) and Rule 10b-5, a plaintiff must prove: (1) the defendant made a false statement or omission of material fact, (2) with scienter, (3) upon which the plaintiff justifiably relied, (4) that proximately caused the plaintiff's damages." *Hillson Partners Ltd. Partnership v. Adage, Inc.*, 42 F.3d 204, 208 (4th Cir. 1994).

Pleading requirements are ordinarily governed by Rules 8 and 9 of the Federal Rules of Civil Procedure, but expanded under the Reform Act. The Reform Act "requires plaintiffs to state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.* the

---

[15]     The Court also notes that both the Sparks and Fink Lawsuits did involve specific allegations of securities fraud under California state law. (Signalife Defs.' Mo. Dismiss, Ex. 14. Fink Complaint, ¶¶ 64-85; Ex. 4, Sparks Cross-claim, ¶ 46.)

defendants intention to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights*, *LTD*., 551 U.S. 308, 313 (2007) (internal citations and quotations omitted.)

A.    Fraud or Misrepresentation.

The Court begins its analysis with the first of these elements: Fraud.  Section 78u-4 of title 15 provides that in any action for securities fraud, the plaintiff must allege that the defendants either, "(a) made an untrue statement of a material fact; or (b) omitted to state a material fact necessary in order to make the statements made, in light of the circumstances in which they were made, not misleading...." 15 U.S.C. 78u-4(b)(1).  Therefore, both false statements and certain omissions are actionable.  "To establish this element, plaintiffs must point to a factual statement or omission-that is, one that is demonstrable as being true or false." *Longman v. Food Lion, Inc.*,  197 F.3d 675, 682 (4th Cir. 1999).  Likewise, "statement[s] of opinion may be a false factual statement if the statement is false, disbelieved by its maker, and related to matters of fact which can be verified by objective evidence."  *Nolte v. Capital One Fin. Corp.*, 390 F.3d 311, 315 (4th Cir. 2004.)

The complainant is further required to "[1] specify each statement alleged to have been misleading, [2] the reason or reasons why the statement is misleading, and, [3] if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1).   The Fourth Circuit has held that in "[d]etermining whether the complaint satisfies this standard necessarily entails a case-by-case assessment of the complaint as a whole."  *Teachers Retirement System of La. v. Hunter*, 477 F.3d 163, 174 (4th Cir. 2007).

For its Complaint, the Plaintiffs list 36 public statements they allege are false or misleading. (Compl.¶¶ 45, 47-52, 54-55, 57-83.)  These statements were made in SEC filings and press releases,

signed or made by one or more of the individual defendants during the class period, and roughly falling into four categories. First, statements made concerning sales and revenue for its flagship product, the Fidelity 100 heart monitoring device. Second, statements made regarding development, production, and commercial viability of its Fidelity 100. Third, statements made regarding development, production, and commercial viability of other company products. And, fourth, material omissions regarding the financial interest and undue influence exerted on Signalife by one of the individual defendants, Defendant Stein. The Plaintiffs then assert that each of these statements or omissions was false and materially misleading for nine specific reasons. (Compl. ¶ 84 (a-i).) Unlike the typical securities fraud action where the Court is asked to draw the line between false and misleading statements and "mere puffery," (*E.g. Raab v. General Physics Corp.,* 4 F.3d 286, 289-90 (4th Cir. 1993)) or misunderstandings (*E.g. Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, ___ F.3d ___, 2009 WL 2366110, *7 (4th Cir. July 31, 2009)), here the Plaintiffs allege wholesale fraud on its investors. Plaintiffs do not just allege that the Defendants withheld negative information, but instead either recklessly turned a blind eye or actively engaged in a conspiracy on behalf of Defendant Stein. The Complaint alleges that promises of sales and market ready products were not only false when made, but also a mere subterfuge, as the Defendants "had no intention of bringing any saleable product to market because [the Company] was a stock manipulation scheme." (Compl. 84(b).)

     1.    Sales Orders For the Fidelity 100.

Regarding the Fidelity 100, the Plaintiffs' allege that the company's repeated claims that they had sales orders and were recording revenues for the Fidelity 100, (Compl. ¶ 62, SEC Form S-8, Oct. 11, 2006; ¶ 63, SEC Form 10-QSB, Nov. 13, 2006, "We have...recorded our first revenues from

product sales [of the Fidelity 100] in October 2006."), were false or misleading because Signalife had "no orders for the Fidelity 100 or any of Signalife's heart monitoring products that would produce any revenue." (Compl. 84(b).) In one statement, Signalife claims to have received a half million dollar sales order that was "currently resulting in revenues to the company..." (Compl. ¶ 73, press release, Oct. 10, 2007.) In another statement, Signalife announced millions of dollars of purchase orders, that if exercised, would lead to significant revenue to the company. ( *Id.* at ¶¶ 75-76, SEC Form 10-QSB, Nov. 14, 2007; ¶ 80, press release, Mar. 17, 2008; ¶ 81, press release Mar. 25, 2008.)

Defendants argue that these statements cannot be considered false, as Signalife "was always careful to define for its investors the difference between marketing efforts and actual sales." (Signalife Defs.' Mo. Dismiss, p. 26.) The Court disagrees. The Plaintiffs have alleged more than merely a misunderstanding of accounting procedures. They have alleged that Signalife had "no orders for the Fidelity 100... that would produce any revenue." (Compl. ¶ 84(d).) Therefore, distinctions regarding accounting procedures do not cure the alleged falsity of these statements. While the Court notes that the Defendants have vigorously denied that these were bogus sales orders, the truth or falsity of these statements is not for the Court's consideration on a motion to dismiss. Rather, all that is required is for the Plaintiffs to allege facts, that if true, form the basis of relief on the Plaintiff's claim. *Teachers' Retir.,* 477 F.3d at 173.

      2.    Marketing, Development, Production, and Commercial Viability of the Fidelity 100.

The next two classes of false and misleading statements involve statements regarding the marketing, development, production, and commercial viability of Signalife's products. The

Plaintiffs' Complaint alleges the following false and misleading statements with regard to the Fidelity 100:

- SEC Form 10-KSB, February 10, 2004. "We anticipate that we will complete a production model of our model 100 heart monitor, integrating both back-end and front-end functions, by the end of fiscal 2005, and will have also commenced commercial marketing efforts by the end of that period." (Compl. ¶ 45.)

- SEC Form 10-QSB, March 31, 2004. "We have recently completed development of the "front-end" or hardware portion of our model 100 heart monitor, and received FDA 510(k) marketing approval on January 28, 2004 to market that portion of the device in the United States on the basis of it being substantially equivalent to other devices on the market. The "front-end" portion of the heart monitor amplifies, collects, processes and records data. We are currently developing the "backend"or software portion of our model 100 heart monitor, which allows the management and interpretation of the data. We intend to use and integrate into our system commercially available software for which FDA approval has already been received by original manufacturer, to manage and interpret this data. We do not believe that integration of this software into our system will require additional FDA approval. Once we have completed these steps, we must design and engineer a "production" model for mass manufacturing which will be durable, reliable and maintenance-free, and competitively priced. We anticipate that we will complete a production model of our model 100 heart monitor, integrating both back-end and front-end functions, by the end of fiscal 2005, and will have also commenced commercial marketing efforts by the end of that period." (*Id.* at ¶ 47.)

- Press release, December 16, 2004. "The completion of pre-production prototype is a significant milestone. In conjunction with Battelle Memorial Institute, we have not only completed a fully functional and compliant Model 100 device, but have done so ahead of schedule, within budget and in alignment with FDA's Quality System Regulations." (*Id.* at ¶ 48.)

- SEC Form 10-KSB, March 31, 2005. "We anticipate that we will introduce our Model 100 Monitor System to the market at the American College of Cardiology Convention to be held in March 2005, and will start selling the devices in early 2006." (*Id.* at ¶ 49.)

- SEC Form 10-QSB, May 16, 2005. "The pre-production version satisfies all performance, safety, environmental and regulatory standards. We are now in the process of conducting various user preference performance comparison test relative to top-end ECG systems in anticipation of our planned introduction of the Model 100 Monitor System to the market. We do not anticipate that we will introduce our Model 100 Monitor System to the market until March 2005, and will not start selling the device until late 2005." (*Id.* at ¶ 50.)

- SEC Form 10-QSB, August 15, 2005. "The pre-production version satisfies all performance, safety, environmental and regulatory standards. We are now in the process of conducting various user preference performance comparison test relative to top-end ECG systems in anticipation of our planned introduction of the Model 100 Monitor System to the market. We do not anticipate that we will introduce our Model 100 Monitor System to the market until March 2005, and will not start selling the device until late 2005." (*Id.* at ¶ 50.)

- SEC Form 10-QSB, May 15, 2006, "We anticipate that we will complete final product modification activities and introduce the final Signalife Holter Monitor to market by the end of fiscal 2006. In the interim, physicians could use the Model 100 Module contained in the Fidelity 100 Monitor System in out-patient ambulatory settings should they choose to do so, although it would not have all the features we would otherwise suggest for out-patient applications." (*Id.* at ¶ 59.)

- SEC Form 10-QSB, August 17, 2006. "We anticipate that we will complete final product modification activities and introduce the final Signalife Holter Monitor to market by the end of fiscal 2006. In the interim, physicians could use the Model 100 Module contained in the Fidelity 100 Monitor System in out-patient ambulatory settings should they choose to do so, although it would not have all the features we would otherwise suggest for out-patient applications." (*Id.* at ¶ 61.)

- SEC Form S-8, October 11, 2006. "We anticipate that we will complete final product modification activities and introduce the final Signalife Holter Monitor to market by the end of fiscal 2006. In the interim, physicians could use the Model 100 Module contained in the Fidelity 100 Monitor System in out-patient ambulatory settings should they choose to do so, although it would not have all the features we would otherwise suggest for out-patient applications." (*Id.* at ¶ 62.)

- SEC Form 10-QSB, November 13, 2006. "Our plan of operation for the twelve month period commencing October 1, 2006 is to commence our marketing and sales activities with respect to our Fidelity 100 Monitor System and Signalife Holter Monitor principally through Rubbermaid..." (*Id.* at ¶ 63.)

- Press release, January 29, 2007. "Signalife also announces that its Marketing Agreement with Rubbermaid, Inc., under which Rubbermaid was granted the exclusive third-party right to market Signalife's Fidelity 100 heart monitor system, was terminated on January 24, 2007, and that Signalife has filed suit against Rubbermaid for its failure to perform under that agreement." (*Id.* at ¶ 64.)

- SEC Form 8-K, January 29, 2007. "In anticipation of Signalife's [lawsuit against Rubbermaid], Rubbermaid also filed a complaint against Signalife... Signalife denies the validity of Rubbermaid's allegations, and believes that they are merely a pretext raised by Rubbermaid in anticipation of Signalife's complaint, and to otherwise enable Rubbermaid

23

to avoid performing its obligations under the Marketing Agreement (which Signalife had previously estimated in its SEC filings would cost approximately $4-5 million to perform)." (*Id.* at ¶ 65.)

- SEC Form 10-KSB, April 2, 2007. "Rubbermaid's principal factual allegation is that Signalife failed to meet projections that the company would independently sell 300 Fidelity 100 units in 2006. ...Rubbermaid also alleges, without providing any support, that the Fidelity 100 was not commercially ready for sale." (*Id.* at ¶ 66.)

- Press release, February 26, 2008. "The Company has completed upgrades and is now manufacturing upgraded units for outstanding orders for its FDA-cleared Fidelity 100.... Not only have we begun manufacturing and delivery schedules for existing orders, but the Company has vigorously pursued and established product demand in [several foreign countries]. (*Id.* at ¶ 79.)

- Press release, March 25, 2008. "Signalife, Inc. has announced that it has been and continues to ship orders under what Dr. Harmison calls an "efficient production line at its manufacturing facility." Additionally, the Company has received an additional $7.5 million in Fidelity 100 device delivery orders in the month of March, 2008, which the company intends to fill during the next two quarters. The company said it may fill these orders sooner." (*Id.* at ¶ 81.)

- SEC Form 10-KSB, April 3, 2008. "Initial shipment of products under the above orders were delayed until the first quarter of 2008 as a consequence of (i) the discontinuance of a laptop computer to be used as part of the Fidelity 100 units, and the need to procure another laptop from another computer manufacturer that would afford comparable bluetooth interoperability and other features as the discontinued Dell model, and (ii) delays by the company's contract manufacturer in setting up its manufacturing production lines. (*Id.* at ¶ 82.)

The last two statements alone give the court pause. While Signalife appears to be telling its investors on March 25, 2008, that its is currently shipping orders for its Fidelity 100 and has an established manufacturing line (*Id.* at ¶ 81), the following week, it appears to be telling investors that it has shipped no orders and has no production line (*Id.* at ¶ 82).[16] Plaintiffs have alleged that

---

[16] At oral arguments, counsel for Signalife argued that the apparent discrepancies in these statements can be explained by the time periods for which the statements covered. Signalife argued that the March 2008 10-KSB covered activities for 2007, and therefore was accurately describing production difficulties that occurred in early 2007, but were now resolved by the time the press releases and 10-Qs

Signalife "had no means to manufacture or market any kind of saleable Fidelity 100 device." (*Id.* at 84(c).) More significantly, the Court returns to the basis alleged by the Plaintiffs regarding why these statements are false. Plaintiffs do not merely allege that Signalife was "puffing" its expectations, but rather that Signalife had "no means to manufacture or market" the Fidelity 100 (*Id.* at ¶ 84(c)) and "was not filling orders by shipping Fidelity 100 devices...." (*Id.* at 84(e)). Also, that "the Individual Defendants had no intention of bringing any saleable product to market because Signalife was a stock manipulation scheme." (*Id.* at ¶ 84(b).) The Court finds these allegations sufficient to meet the requirements for pleading the falsity of these claims.

> 3. Marketing, Development, Production, and Commercial Viability of Other Signalife Products.

With regard to Signalife's other products, Plaintiffs make the similar assertions. Plaintiffs cite to statements in which Signalife "anticipate[s] that we will complete final product modification activities and introduce the final Signalife Holter Monitor to market by the end of fiscal 2006." (Compl. ¶ 59, SEC Form 10-QSB, May 15, 2006; ¶ 61, SEC Form 10-QSB, Aug. 17, 2006; ¶ 62, SEC Form S-8, Oct. 11, 2006; ¶ 63, SEC Form 10-QSB, Nov. 13, 2006 .) Signalife is also alleged to have referred to these products as "beyond prototype and is expected to be submitted to the FDA shortly", and "in final performance evaluation and testing and expected to be submitted to the FDA later this year." (*Id.* at ¶ 79). Yet, Plaintiffs allege that these products were still in development and "in a concept phase." (*Id.* at ¶ 84(h & I).) This distinction is a factual difference that if true, could make the Defendants'

---

were made in the later part of 2007 and early 2008. This may be the case, but when the difficulties occurred, and if they were in fact resolved, (as Plaintiffs assert they were not), is a factual question, not proper for the Court's resolution on a motion to dismiss.

statements false, and therefore, meets the pleading requirement.

        4.      Stein's Control of Signalife.

The final category of allegedly false and misleading statements or omissions regards a failure to disclose Stein's control of the company. In addition to a general failure to disclose, the Complaint lists statements made concerning Signalife stock ownership by ARC Finance. (Compl. ¶¶ 54, & 69.) The Complaint alleges that ARC Finance was the alter ego of Stein, and that Stein was making all the decisions at Signalife, including what information was put out in public filings. (*Id.* at ¶ 34.) Failure to disclose Stein's control, if true, would be necessary information to its investors. *Ottmann v. Hanger Orthopedic Group, Inc.*, 353 F.3d 338, 343 (4th Cir. 2003).

        B.      <u>Materiality</u>.

Defendants next assert that certain of the challenged statements lack materiality. For a misrepresentation or omission to violate the Securities Act, it must be material. The question of materiality is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 445, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). A misrepresented or omitted fact is material if there is a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of a reasonable shareholder. *Id*. at 449. Disclosure of the true facts or the omitted fact must be viewed by the reasonable investor as having significantly altered the "total mix" of information made available. *Id.* While the question of materiality is a mixed question of law and fact, materiality may be resolved as a matter of law if the Court finds that no reasonable juror could find it substantially likely that a reasonable investor would find the facts or omissions material in the "total mix" of information. *E.g. TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976).

Without conceding that any of the alleged statements or omissions were false or misleading, Defendants challenge the materiality of Plaintiffs' claims regarding Signalife's marketing and sales efforts. Defendants argue that investors were informed by the total mix of information available to the market regarding its actual sales revenues, its market efforts, and the status of its products, therefore, these statements could not be misleading. (Signalife Defs.' Mo. Dismiss, pp. 31-33.) This Court disagrees. If, as the Plaintiffs have alleged, Signalife never had a marketable product or a means to manufacture that product , and never had sales orders that would produce revenue, a reasonable investor would likely find this information material in making an investment decision. *Phillips v. LCI International, Inc.*, 190 F.3d 609, 613 (4th Cir. 1999.) ("If a reasonable investor, exercising due care, would gather a false impression from a statement, which would influence an investment decision, then the statement satisfies the initial element of a 10(b) claim.")

C.    Safe Harbor.

Defendants further argue that several of its allegedly false and misleading statements are protected by the Safe Harbor provision of the Reform Act.  15 U.S.C. § 78u-5(c)(1) provides that:

> [I]n any private action arising under this chapter that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, a person referred to in subsection (a) of this section shall not be liable with respect to any forward-looking statement, whether written or oral, if and to the extent that--
> (A) the forward-looking statement is--
> (i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement.

To qualify under this provision, the statements must be both forward-looking, and be accompanied by meaningful cautionary language that identifies the important factors as to why result may differ.  This

Court agrees that some, but not all, of the complained statements contain the language typically associated with anticipated results. *Compare* Compl. ¶¶48, 51, 54, 57, 59, 61-63, 66-67, 70-75, 80-82 *with* Compl.¶¶ 45, 47, 49-50, 52, 58, 59, 61-63, 66, 68, 72, 76, 80, 83. Those in the former category, which do not contain specific language of anticipated results, obviously fall outside of this doctrine. *E.g.* Compl. ¶ 51. ("The pre-production version satisfies all performance, safety, environmental and regulatory standards.") Those in the later category, which contain such sign posts as "anticipated" and "expected," fail to satisfy the second prong of the forward-looking statements doctrine, as the cautionary language does not inform investors of the specific type of risks the Plaintiffs now allege. In other words, while the SEC filings and press releases may contain or reference cautions of potential risks, (*E.g.* potential delays caused by third-party manufacturers or marketers), they do not caution investors that Signalife is actually a stock fraud scheme with no products to sell and no intention of bringing products to market. The safe harbor provision does not apply when the "meaningful cautionary language" is wholly different than the material facts known to the Defendants that eventually cause the forward looking statements to be false. *E.g. Grossman v. Novell,* 120 F.3d 1112, 1120 *(10th Cir. 1997)* ("However, not every risk disclosure will be sufficient to immunize statements relating to the disclosure; rather the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions which the plaintiffs challenge.")

    D.    <u>Loss Causation</u>.

    Loss causation is not one of the § 10(b) elements that the Reform Act imposes a more stringent pleading requirement. *In Re Mutual Funds Invest. Litig.*, 566 F.3d 111, 119-20 (4th Cir. 2009) ("Consequently, the PSLRA's heightened pleading requirements do not govern our analysis of the elements of reliance or loss causation.") It is, however, subject to Rule 9(b) requirements. *Id.* at 120.

Plaintiffs are required "plead [that the material misrepresentations or omissions actually caused the loss for which the plaintiff seeks damages] with sufficient specificity to enable the court to evaluate whether the necessary causal link exists." *Id.*

All parties cite *Dura Pharm, Inc. v. Broudo*, 544 U.S. 336 (2005) as authority for their arguments. In *Dura,* the Supreme Court rejected the Ninth Circuit's holding that a complaint adequately alleges loss causation "simply by alleging in the complaint ... that 'the price' of the security 'on the date of purchase was inflated because of the misrepresentations.'" *Id.* at 338. Following an explanation of how § 10(b) claims resemble common-law tort actions for deceit and misrepresentation (*Id.* at 341), the Court noted that merely alleging that a stock was overpriced when purchased does not necessarily mean that the purchaser has suffered a loss. (*Id.* at 342) ("For one thing, as a matter of pure logic, at the moment the transaction takes place, the plaintiff has suffered no loss; the inflated purchase price is offset by ownership of a share that at that instant possesses equivalent value.")

In the present case, the Plaintiff have alleged more than just a false or misleading statement that caused a rise in Signalife's stock price. (*See* Compl. ¶¶ 44-83.) Plaintiffs allege a series of false and misleading statements over a period of years which acted to boost investor confidence in developing products.[17] Included in these statements were assertions that market validating sales orders had been placed, an efficient production line was established, orders were being shipped, and revenue was being recorded. (Compl. ¶ 73-81.) On the heels of these pronouncements, Signalife invited investors to

---

[17] "On the Company's announcement that it would soon begin commercial marketing, the stock immediately began an upward assent and climbed from $3.65 to $8.20 by mid-April 2004." Compl. ¶ 46.

"Upon the Company's [press] release, Signalife's stock climbed 5% to $3.25 on extremely heavy trading volume." *Id.* at ¶ 56.

participate in a webcast with CEO Harmison where it promised "to provide direction on new contracts, pending orders and production...." (Pl. Opp. Signalife Mo., Ex. 21, p. 1) The Plaintiffs' Complaint then alleges that the webcast "provided no information concerning the tens of millions of dollars of purchase orders..." And only "stated that Signalife expected to realize more than $40 million of gross revenue over 'the next four to five quarters' but provided no facts to support the Company's long term projection." (Compl. ¶ 85.) As a result, Plaintiffs further allege that "the Company's stock dropped 13% on April 14, 2008 to close at $1.34 on unprecedented [trading] volume." (Compl. ¶ 87.)

While this loss causation theory is perhaps novel in terms of the typical situation where plaintiffs point to some recent announcement of bad news and a corresponding drop in the stock's value.[18] It is not, however, unsupported by the holding in *Dura*. In fact, the *Dura* Court specifically cited "changed investor expectations" as one of many factors that can account for the change in stock price. 544 U.S. at 343. The value of any given stock is an inherently speculative practice, based upon both hard facts and reasonable inferences made from available information. All that is required at this point in the litigation is for the Plaintiffs to allege a causal connection between the false, material statements and the loss that occurred, with sufficient specificity so as to put the Defendants on fair notice of their theory for recovery. *Dura*, 544 U.S. at 347. Here the Plaintiffs have done this.[19]

---

[18]     Neither party cites to, and the Court does not find, any case law addressing these type of factual allegations. Several courts, in the wake of *Dura*, have held that a full corrective disclosure by the company is not required to prove loss causation. *E.g. In re Williams Sec. Litig.*, 558 F.3d 1130, 1137-38 (10th Cir. 2009) ("By premising [loss causation] on a leakage theory rather than a corrective disclosure theory, ...does not automatically run afoul of *Dura*.")

[19]     The Court acknowledges that a loss causation theory based solely on a drop in stock price has the inherit danger of leading to "reverse engineering" of securities fraud suits in the absence of any newly released information. That is not what the Court has done here. The Court's holding is based on specific factual allegations

30

E.    Scienter.

The final element challenged by the Defendants is a failure to plead scienter. As noted above, in addition to the normal pleading requirements, the Reform Act requires that a plaintiff "must allege that the defendant made the false or misleading statement or omission intentionally or with severe recklessness regarding the danger of deceiving the plaintiff." *Teachers Ret.*, 477 F.3d at 184. The Reform Act then significantly strengthens the requirement for pleading scienter by providing :

> In any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission allege to violate this chapter, **state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind**.

15 U.S.C. 78u-4(b)(2)(emphasis added.) Courts have interpreted this statute to require a "strong inference" that each defendant acted with at least recklessness in making the false statement or omission. *Tellabs, Inc.,* 437 F.3d at 602-3. If the defendant is a corporation, the plaintiff must allege facts that support a strong inference of scienter with respect to at least one authorized agent of the corporation. *Teachers,* 477 F.3d at 184 citing *Tellabs*, 437 F.3d at 602-2. The Court examines each statement alleged to have been made by each Individual Defendant.

1)  Defendant Harmison.

Defendant Harmison served on Signalife's board of directors continuously during the class period and was CEO of the company from August 17, 2007 until May 2008. (Compl. ¶ 36.) Plaintiffs point to eight different statements they attribute to Harmison and allege are materially false and

---

pointing to an alleged rise in investor expectations and stock price, as well as apparent promises from the company to discuss certain core business concerns, followed by the alleged failure to address these very concerns.

misleading. (Pl. Memo Opp. Harmison & Bunes, pp. 18-21.)  These statements were made between October 10, 2007 and April 7, 2008.  In these statements, Harmison provided information regarding sales orders, revenues and the production status of the Fidelity 100.  Beginning October 2007, a Signalife press release informed investors that certain recent sales orders were "currently resulting in revenues to the company such that the company anticipates achieving break-even status by the end of January 2008, or at the very latest the end of 2008 first quarter." (Compl. ¶ 73.)  In November 2008, Harmison signed a SEC filing that predicted that these new orders would be "fully filled by the end of the first quarter of fiscal 2008. " (*Id.* at ¶ 74.)  Following that, in February 2008, Signalife issued a press release through Harmison that stated that Signalife had "begun manufacturing and delivery schedules for existing orders" and had "completed upgrades and is now manufacturing upgraded units" (*Id.* at ¶ 79).  One month later, in March 2008, Signalife issued another press release that claimed it "continues to ship orders" and announced an "additional $7.5 million in orders." (*Id.* at ¶ 81.) Harmison is quoted in this same press release describing Signalife as having "an efficient production line at its manufacturing facility" and "very comfortable with our production line capabilities in terms of their immediate capacity."  (*Id.* at ¶ 81.) Yet, in Signalife's annual report, signed by Harmison and filed only months after these statements were made, Harmison describes the shipment of these orders as "delayed" as a consequence of the discontinuance of a laptop computer needed as a part of the Fidelity 100 package, and delays in setting up the production line. (*Id.* at ¶ 82.)

Plaintiffs argue that the inconsistency of these statements demonstrate that Harmison had actual knowledge that no sales orders existed and the prior statements were a ruse.  As additional evidence that Harmison knew these statements were false when made, Plaintiffs alleged that a confidential witness, ("CW2") described as a significant Signalife investor, was told by Harmison after

his April 14, 2008 webcast, that these alleged sales orders "did not exist" and that Harmison knew nothing about the press releases that touted these sales. (*Id.* at ¶ 18.)

Defendants argue that the Court should find this statement too vague and the source too vaguely-described to attach any credibility. "When the complaint chooses to rely on facts provided by confidential sources, it must describe the sources with sufficient particularity to support the probability that a person occupied by the source would possess the information alleged, or in the alternative provide other evidence to support their allegations." *Teachers Retire.*, 477 F.3d at 174 (internal quotation omitted.) Here CW2 is described as a "significant investor... who had frequent and direct personal communications with Stein and Harmison" (*Id.* at ¶ 43.) The Court find this description, along with the other corroborating evidence– including the alleged timing of this conversation and the recent inconsistency of Signalife's public statements– make CW2 sufficiently reliable for the Court to attach some credibility to this witnesses' statements.

In evaluating whether the Plaintiffs' factual allegations give rise to a strong inference of scienter, the Court must first address whether "they permit an inference of scienter, and if so, the persuasiveness of that inference." *Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, __ F.3d __, 2009 WL 2366110, 7 (4th Cir. 2009) The Court must "evaluate plaintiffs' allegations of scienter holistically" and "only afford their allegations the inferential weight warranted by context and common sense." *Id.* citing *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 625-26 (4th Cir. 2008). Finally, the Court must consider "whether a reasonable person would deem any inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* citing *Tellabs*, 551 U.S. at 324.

First, the Court considers the persuasiveness of these factual allegations, and the competing

inferences regarding Harmison's alleged false and misleading statement of sales in 2007-2008. *Matrix*, 2009 WL 2366110 at *7. Based upon the allegations now before the Court, it finds two plausible inferences. First, Harmison was lying both when he stated he knew nothing about the press releases and again about the alleged sales and production status. Such an inference obviously gives rise to a strong inference of scienter. Alternatively, Harmison was telling the truth, and as CEO of the company, he knew nothing about press releases touting significant new sales orders. These inferences are evaluated holistically, in the context of all the factual allegations, including the Sparks, Fink, (and by this time), the now filed Rubbermaid lawsuits. Additionally, Harmison signed the November 14, 2007 SEC Form 10-QSB, which specifically described these new sales orders (*Id.* at ¶ 75.) This inference is sufficient for a reasonable investor to infer that Harmison was at least acting with severe recklessness. Therefore, the Court finds that with regard to the above-referenced statements allegedly made by Harmison in 2007-2008, a strong inference of scienter exists to fulfill the Reform Act's pleading requirements.

    2)   Defendant Bunes.

    Defendant Bunes was CEO from April 15, 2005 until August 17, 2007. (Compl. ¶ 35.) Bunes was also a member of Signalife's Board of Directors in 2004-2005, and signed certain SEC documents during those years. Plaintiffs challenge several statements made by Bunes between April 2006 and April 2007, as being materially false or misleading, and that Bunes made these statements knowing they were false, or at least with extreme recklessness. As evidence that Bunes knew these statements were false when made, Plaintiffs' refer to several new documents and make several new factual allegations regarding Bunes knowledge and involvement. (Pl. Memo. Op. Harmison & Bunes, pp.8-18.) ("In addition to the allegations set forth in the Complaint,...Plaintiffs provide additional facts....") Plaintiffs further request that the Court take judicial notice of certain documents, not attached

to nor referenced in their Complaint. *Id.* at p. 8, n. 7. Included in these documents are certain meeting notes from joint Signalife/Rubbermaid meetings, correspondence from Rubbermaid to Signalife, and deposition excerpts from the Rubbermaid/Signalife lawsuits. The Court is without authority to consider these documents for purposes of a 12(b)(6) motion to dismiss. *Phillips v. LCI International, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999.) They are neither explicitly relied upon in the Plaintiffs' Complaint, nor are they publically available documents that are offered solely for purpose of showing that the alleged information was publically available. *Staehr v. Hartford Fin. Serv. Group, Inc.* 547 F.3d 406, 426 (2nd Cir. 2008). Instead, the Plaintiffs ask the Court to consider these documents as proof that Defendant Bunes had actual knowledge that Signalife's products were not meeting announced production time lines, as repeatedly set forth in Signalife's SEC filings.

However, even without taking judicial notice of these additional documents, there appears to be a sufficient pleading of scienter as to Defendant Bunes, as explained at pages 35-36.

3)      <u>All Individual Defendants</u>.

The Plaintiff argue three alternate theories, alone or in combination, exist establish scienter as to all the Individual Defendants. Specifically, they allege that scienter is established by 1) the Individual Defendants' signing of certain SEC documents (Pl. Mo. Opp. Harmison & Bunes, pp. 21-23), 2) the fact that the alleged statements were all related to Signalife's "core business operations" (Pl. Mo. Opp. Signalife, pp.8-13) and, 3) that the Individual Defendants had "motive and opportunity" to defraud the market (*Id.* at pp. 13-14). The Court addresses these arguments in turn.

a)      <u>Signing SEC Documents</u>.

Plaintiffs argue that the Individual Defendants' signatures on Sarbanes-Oxley certifications

("SOX Certification")[20], included in all SEC filings, give rise to a strong inference of scienter. (Op. Harmison, pp. 21-23.) While no court has held that merely signing a SOX Certification gives rise to an inference of scienter, if "other alleged facts establish[] that the signor recklessly ignored 'red flags' that the attested-to financial statements contained material falsities" an inference can exist. *In re BearingPoint, Inc. Securities Litig.,* 525 F.Supp.2d. 759, 773 (E.D. Va. 2007), *rev'd. on other grounds*, *Matrix Capital Management Fund, LP v. BearingPoint, Inc.*, __ F.3d __, 2009 WL 2366110, 7 (4th Cir. 2009) (citing *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006.) [21]

Defendants argue that the Plaintiffs fail to allege what "red flags" had been raised that would cause the Defendants to be put on notice of potential "irregularities." (Signalife Reply, p. 12.) This argument appears to directly contradict the Defendants prior arguments that the Sparks and Fink Lawsuits created sufficient storm warnings to put the Plaintiffs on inquiry notice of their claims. If allegations by two consecutive CEOs would be sufficient to place the Plaintiffs on notice of a securities fraud allegation, why would not the same storm warnings, (specifically those that allege that Signalife's corporate officers were not being allowed to conduct adequate due diligence and could not to speak to each other or to Signalife's corporate counsel regarding various Signalife business matters), act to put

---

[20]     SOX Certifications require signators to attest to, among other things, the fact that the SEC filing "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statement made, in light of the circumstances under which such statements are made, not misleading..." PL 107-204, § 302(a)(2).

[21]     "Instead, we hold that a Sarbanes-Oxley certification is only probative of scienter if the person signing the certification was severely reckless in certifying the accuracy of the financial statements. This requirement is satisfied if the person signing the certification had reason to know, or should have suspected, due to the presence of glaring accounting irregularities or other 'red flags,' that the financial statements contained material misstatements or omissions." *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1266 (11th Cir. 2006.)

officers on the same notice of wrong doing?  The Court recognizes that the distinction here may be one of degrees.  Yet, for the pleading purposes, the Plaintiffs are only required state an inference of wrongful intent that is at least as compelling as the competing innocent one(s).

As to Harmison and Bunes, the Court finds the culpable inference at least as compelling. Harmison is alleged to have been personally involved in the sales, marketing and production activities that the Plaintiffs allege were false and misleading.  Bunes is alleged to be as intimately involved in the sales and production activities that form the basis of her alleged false and misleading statements.  Bunes admits as much. (Bunes Op. Memo., pp. 3-6) ( *E.g.* "After engaging in two years of extensive marketing and commercialization efforts, Ms. Bunes left Signalife on August 17, 2007.") Therefore, it follows that a strong inference of scienter attaches to these statements.  Conversely, Plaintiffs have made only general allegations as to Defendants Pickard, Schere and Matthews.  (Compl. ¶¶ 37, 38, 40.)  The Court finds the lack of specific allegations as to these Defendants insufficient to give rise to a strong inference of scienter.

b)        Core Business.

The Plaintiffs ask this Court to adopt a yet undeveloped theory in finding scienter.  They alleged that "it would be absurd for the Individual Defendants, in their executive positions, not to know the truth about their core business operations." (Pl. Mo. Op. Signalife, pp. 8-9.)  Such an overarching theory of recovery runs counter to the purposes of the Reform Act.  *See Tellabs,* 551 U.S. at 313 ("Exacting pleading requirements are among the control measures Congress including in the PSLRA.") Moreover, the Court finds the cases cited by the Plaintiffs for this proposition less encompassing than alleged. *E.g. In re Sears, Roebuck and Co. Sec. Litig.*, 291 F.Supp.2d 722, 727 (N.D. Ill. 2003) (finding that the plaintiffs' core operations allegations were "backed up by statements in the complaint about

37

numerous statements made by various defendants [regarding the assertion that these defendant had actual knowledge of the falsity of the statements.]") The Court finds no case where mere allegations that an executive "should" have information about a fact sufficient, without more specific statements as to how or why they also would know these facts. Accordingly, the analysis of a "core business" theory mirrors the analysis of a finding of scienter for signing SOX certifications. The Court agrees that scienter is established as to Defendant Bunes and Harmison, and rejects the Plaintiffs' argument as to Defendants Pickard, Schere and Matthews.

c) <u>Motive and Opportunity</u>.

Finally, Plaintiffs assert that each of the Individual Defendants had both motive and opportunity to manipulate Signalife's stock price, therefore, a strong inference of scienter exists as to each. However, the motives alleged, that the Individual Defendants were controlled by Stein, and presumably in fear for their jobs, or desperate to keep Signalife afloat, have been routinely rejected by the courts. *E.g. Cozzarelli v. Inspire Pharms., Inc.,* 549 F. 3d 618, 627 (4th Cir. 2008) ("a strong inference of fraud does not arise merely from seeking capital to support a risky venture. Indeed, the motivations to raise capital or increase one's own compensation are common to every company and thus add little to an inference of fraud.") Additionally, there is no allegation that any of the defendants, other than Stein, profited from any stock sales. The Court therefore rejects Plaintiffs' motive and opportunity theory as to each of the Individual Defendants.

**3.** **<u>15 U.S.C. § 78t, "Controlling Persons" Claims Against Individual Defendants</u>**.

Having found that the Plaintiffs have sufficiently plead a §10(b) violation, the Court now

turns to the Defendants' assertion that the §20(a) violations are insufficiently pled.[22]  Section 20(a) of the Securities Exchange Act of 1934 provides that:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

Simply stated, an action under Section 20(a) alleges that to the extent that a defendant did not commit a 10b5 violation, they exercised control within the meaning of the statute over those who did, and therefore, are liable.

Defendants Pickard, Scherne, Matthews, Harmison and Bunes (collectively "Individual Defedants")[23] argue that the factual allegations in Plaintiffs' own Complaint prevents the Plaintiffs from arguing "control" as to these Defendants.  More particularly, the Individual Defendants note that since the Plaintiffs have alleged that Defendant Stein exercised "actual" control over Signalife during the class period, the Individual Defendants could not simultaneously be exercising control. (Signalife Defs.' Mo. Dismiss, pp. 37-38.)  The Court rejects this argument.

---

[22]     Counsel for Signalife conceded that a § 10(b) claim against Defendant Drakulic may qualify under a core business theory to establish scienter.  As such, in addition to the Court's finding of colorable § 10(b) claims against Defendants Harmison, Bunes and therefore, Signalife, a claim against Drakulic may also remain.

[23]     Mitchell J. Stein and Budimir S. Drakulic are also individual defendants in this consolidated action, however, as noted above (*supra*, n.1), they have not moved for dismissal and are therefore not considered for dismissal on this claims. Additionally, while Defendants Bunes and Harmison do not specifically make this argument in their separately filed briefs, both have requested to join in all the Signalife Defendants' arguments, so the Court includes them here. (*See generally* Docs. # 44 & 53.)

39

For the purposes of Section 20(a) liability, the Securities and Exchange Commission defines "control" as "possession, direct or indirect of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2. The plain language of this regulation refers to the "power" to control, not the actual involvement of a defendant in any particular act or omission. *Harrison v. Dean Witter Reynolds, Inc*., 974 F.2d 873, 881 (7th Cir. 1992) (holding that control person liability exists, "whether or not that power was exercised.") In other words, a corporate officer should not be rewarded if he or she had the ability to stop wrongful conduct, but instead turned a blind eye.[24]

Courts have held that a plaintiff satisfies the control requirement by pleading facts showing that the controlling defendant "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *Brown v. Enstar Group, Inc*., 84 F.3d 393, 396 (11th Cir.1996). Courts has also recognized that the question of whether someone qualifies as a controlling person under Section 20(a), is "a complex factual question" *(SEC v. Coffey*, 493 F.2d 1304, 1318 (6th Cir.1974)), "not ordinarily subject to resolution on a motion to dismiss." *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1306 (10th Cir.1998). Dismissal is only appropriate in cases where "a plaintiff does not plead any facts from which it can reasonably be inferred

---

[24]     The Court makes no finding here as to whether any Individual Defendants exercised control over the alleged violations, only that the Plaintiffs have sufficiently pled this cause of action. *Maher v. Durango Metals, Inc.*, 144 F.3d 1302, 1305 (10th Cir.1998). "[O]nce the plaintiff establishes the prima facie case [of control], the burden shifts to the defendant to show lack of culpable participation or knowledge." *Id*.

the defendant was a control person." *Id*.

The remedial nature of Section 20(a), requires a liberal construction, in favor of finding liability. *Sennott v. Rodman & Renshaw*, 414 U.S. 926, 929 (1973) It requires "only some indirect means of discipline or influence short of actual direction to hold a 'controlling person' liable." *Id.* "A claim of control person liability must allege: (1) a predicate violation of § 10(b) and, (2) control by the defendant over the primary violator." *In re Mutual Funds Invest. Litig.*, 566 F.3d 111, 129 (4th Cir. 2009).

Having determined that the predicate violation requirement has been met, the Court reviews the Complaint to determine if the Plaintiffs have alleged that the Individual Defendants "had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 661 (E.D.Va.2000) (quoting *Brown v. Enstar Group, Inc*., 84 F.3d 393, 396 (11th Cir.1996)

SEC regulations define "control" as "possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2 (2008); *see also* H.R.Rep. No. 73-1383, at 26 (1934) ("[W]hen reference is made to 'control', the term is intended to include actual control as well as what has been called legally enforceable control.").

For their Complaint, the Plaintiffs set forth the following factual allegations:

•       Throughout the Class Period, the Individual Defendants were controlling persons of Recom/Signalife within the meaning of Section 20(a) of the Exchange Act and culpable participants in the fraud at Recom/Signalife... ." (Doc # 1, ¶ 120.)

•       Each Individual Defendant exercised control over Recom/Signalife during the Class Period

by virtue of, *intra alia*, their executive positions with the Company, the key roles they played in the management of Recom/Signalife and their direct involvement in the Company's operations, including its financial reporting and accounting functions. *Id.* at ¶ 121.

- [T]he Individual Defendants (other than Stein) were regularly presented to the market as the persons responsible for Recom/Signalife's day-to-day business and operations and the Company's overall strategic direction. The Individual Defendants (including Stein) presented quarterly and annual results, set guidance for future reporting periods and assured the market as the persons responsible for Recom/Signalife's day-to-day business and operations and the Company's overall strategic direction. At Recom/Signalife, the Individual Defendants (including Stein) had ultimate responsibility for, and control over, the Company's internal activities and public statements, and no one else at Recom/Signalife exercised similar degrees of responsibility and control. *Id.* at ¶ 122.

Having carefully reviewed the Plaintiffs' Complaint, including the above-cited paragraphs, the Court finds that the Plaintiffs have sufficiently pled a claim against the Individual Defendants for a § 20(a) violation.

## CONCLUSION

Defendants' motions are **GRANTED** in part and **DENIED** in part. As set forth more fully in this Order, Plaintiffs' § 10(b) claims regarding Defendant Stein's control of Signalife, and the commercial viability of Signalife's Fidelity 100 heart rate monitor are **DISMISSED** as time barred by the statute of limitations. Plaintiffs' § 10(b) claims against Defendants Matthews, Scherne and Pickard are **DISMISSED** for failure to properly plead scienter. Defendants' motions to dismiss Plaintiffs' remaining § 10(b) claims against Defendants Signalife, Harmison and Bunes are **DENIED**. Likewise, because the Court finds these § 10(b) claims sufficient to survive a motion to dismiss, the Defendants' motions to dismiss the Plaintiffs' § 20(a) claims against all Individual Defendants are also **DENIED**.

Additionally, as certain of the Plaintiffs' claims are dismissed under the statute of limitations, and the Supreme Court has recently granted certiorari review in *Merck & Co., Inc. v. Reynolds,* 129 S.Ct. 2432 (2009), a case involving the proper test for accruing this statutory period, the

Court orders this entire matter **STAYED** until after the Supreme Court publishes its decision in *Merck*. At that time, any party to this action may move this Court to lift the stay, and if necessary, also move to reconsider based upon any change of law made by the *Merck* decision.

The parties are ordered to contact the Court on April 1, 2010, for a status conference in the event the stay is not lifted prior to then. In the event the parties learn of a decision being rendered by the Supreme Court in *Merck*, they should notify the Court.

**IT IS SO ORDERED.**

s/R.Bryan Harwell
R. Bryan Harwell
UNITED STATES DISTRICT JUDGE


September 4, 2009
Florence, South Carolina